53 So.2d 568

## BURGESS v. STATE.
### 6 Div. 179.

Supreme Court of Alabama.
June 14, 1951.

Jas. F. Berry, Murray A. Battles and Ralph Bland, all of Cullman, for appellant.

Si Garrett, Atty. Gen., and Thos. M. Galloway, Asst. Atty. Gen., for the State.

BROWN, Justice.

The tragedy portrayed in the trial of the case in hand, resulting in the conviction of the appellant John Burgess of the offense of murder, occurred about midnight July 13, 1950, in a community in the southwestern section of Cullman County which its inhabitants have dubbed "Bug-Tussle". One of the characters involved in the tragedy was Tom Payne, a farmer twice married and twice a widower, a man in his late sixties. At the time mentioned he lived in the second house at the foot of a hill on the settlement road leading from the cross roads at the main highway, apparently the community center, through the community.

Payne's house was near a flowing spring the branch of which flowed down the ravine under the hill below the home of his neighbors Row Green and wife about four hundred yards distant from his own. Green was an invalid and was confined to his bed. His wife was the daughter of the familiar character "Fiddling Tom Freeman." Mrs. Green attended her husband with the aid of a niece, Pernie Swann, a granddaughter of "Fiddling Tom" and on

the night in question Martha Freeman, Tom's wife, referred to in the testimony as "Granny Freeman", was at the home of the Greens when Andrew Jackson appeared about nine o'clock, aroused the inmates and tried to induce Pernie, apparently an attractive curly haired girl fifteen years old, to go out with him in the night and drink homebrew, a quantity of which he brought with him, which she refused to do. While Jackson was at the Green home the dogs at that habitation—the sentinels of the night in such out of the way rural communities—continued their barking as if someone else was on their premises and appellant Burgess subsequently stated to some of the witnesses in the case that he was there at the Green house and heard every word that was said by and between the parties in the home,—Jackson, Mrs. Green and Pernie. The undisputed evidence shows that before going to the Green's residence Jackson was at the Burgess house located on the settlement road about three hundred yards from the cross roads and within from 200 to 300 yards from Tom Payne's house. Burgess and Jackson talked about a job of work which Jackson claimed he had found and incidentally about women, apparently Grace and Pernie. At this time Jackson was drinking, had a bundle of some kind under his arm and had with him what appeared to Burgess to be a single barrel shotgun. Burgess testified that he could not tell whether it was an automatic or not.

There was born to Tom Payne and the wife of his first marriage a daughter *mutus et furdus à nativitate* (a deaf-mute), whom they named Grace, "lacking the sense of hearing and the faculty of speech." Webster's Unabridged Dictionary (2d ed.), p. 675. There was born to said Payne and his second wife a son in all respects apparently normal. At the time of the trial the son Frank Payne was 42 years of age, married and had established a home in the community about two miles from his father's house, where he lived with his wife and children.

Grace during her early childhood, as the evidence goes to show, attended one session of the state school for deaf and blind chil-

dren and aside from this was uneducated, except through the school of experience and necessity. Aside from the infirmities mentioned she seemed to be normal. She and her father lived alone. She kept the house, did the cooking and worked in the field chopping cotton, picking cotton, doing the family washing and other chores. The evidence tends to show that she was physically attractive, possessed sex appeal, and that the defendant Burgess liked to be in her company and could understand her in her efforts and gesticulations as a means of conveying her thoughts. There was evidence tending to show that Burgess' attentions and association with Grace aroused the resentment of her father and the jealousy of Burgess' wife. Both Burgess and Jackson had just recently moved into the community and lived therein about a year or more. Jackson lived with his uncle, a Mr. Hudson, a tenant farmer and worked for him in crop time and both he and Burgess worked at the neighborhood saw mill and at odd jobs when they were available.

On the date mentioned, July 13, 1950, Tom Payne was bludgeoned to death and robbed in his room about midnight. There was no one in the house other than the deceased and his daughter Grace, who was offered by the state as an eyewitness, and was permitted by the court to testify over the strenuous objections of the defendant and exceptions duly reserved thereto. These rulings present the major contentions by the appellant for the reversal of the judgment of conviction.

The brother of Grace Payne was examined on the *voir dire* touching his ability to communicate with her and elicit from her facts pertaining to things and acts which she had observed and his ability to interpret her arbitrary signs, motions and gesticulations in response to his effort to interrogate her in respect to the occurrence which she had observed through the sense of sight. The evidence goes to show that for a series of years he and his sister had been enabled to understand each other by the means used, which time and necessity had invented between them. The subjects of their conversations, no doubt, had been confined to the domestic concerns and familiar occurrences of daily life.

She was also examined through her brother, as interpreter, after being sworn on the *voir dire* as to the sanctity of the oath, as to her knowledge of God and her concepts of Christianity and the examination goes to show that she had a true notion of the moral and religious nature of an oath and of the temporal danger of perjury. She recognized a picture of the Christ and expressed the thought that he was the author of the Bible and one who swore falsely would have to seek forgiveness from him or be punished.

█ It is well settled by modern authority that it is permissible for such witness to testify as against the objections that the party against whom such testimony is given will be put to great disadvantage in cross-examination to test the witness's credibility. 5 Chamberlayne, The Modern Law of Evidence, §§ 3635, 3636; Pruitt v. State, 232 Ala. 421, 168 So. 149. And it is observed by Prof. Chamberlayne in the last paragraph of said § 3636, pp. 5171–72, that: "And though a dumb person may not be educated in the use of signs and can only express assent or dissent by a nod or shake of the head, thus rendering cross-examination difficult, he may nevertheless be permitted to testify, but it is said that his disability may be considered by the jury, as bearing upon the weight of his testimony. That difficulty attends the examination of a deaf-mute is no reason why his testimony should be excluded,", citing Quinn v. Halbert, 1882, 55 Vt. 224; Ritchey v. People, 1896, 23 Colo. 314, 47 P. 272, 384; Rushton's Case, 1 Lea.C.C. 455(1786); State v. De Wolf, 1830, 8 Conn. 93, 99; Snyder v. Nations, 1840, 5 Blackf., Ind., 295.

██ In determining the qualifications of such witness to testify and the selection and qualification of the interpreter, much must be left to the sound discretion of the trial court who has full opportunity to see and observe the witness, and the interpreter, in the presence and hearing of the interested parties and their counsel, much of which cannot be portrayed on the written

pages of the record. Pruitt v. State, supra; 53 Am.Jur. p. 44, § 29. We, therefore, hold that the circuit court did not err in permitting the witness Grace Payne to testify against the defendant. Nor was error committed in allowing her brother Frank Payne to act as the interpreter of her testimony.

The evidence is without dispute that the deceased Tom Payne was bludgeoned by a club or a blunt weapon of some sort by a blow upon his head above his right eye, causing an open wound, and so injuring his brain that he died 3 or 4 days later in the hospital without ever regaining consciousness. The medical testimony goes to show that the blow not only injured his brain but fractured his skull so that he bled from his ears and his nose and became totally unconscious, symptoms indicating a fractured skull. Grace Payne, his daughter, was the only person in the house with him on the night of the assault upon him. She testified, through her brother, sworn as required by law to make true interpretations and relate the facts to the jury, that she saw two persons enter the room, one through the front door and the other through the window of the deceased's room; that a scuffle immediately ensued and that Andrew Jackson, who is indicted as an accomplice with the appellant Burgess, struck her father (the deceased) with a club over his eye, knocking him to the floor, where he bled profusely on the floor and on the bed; that Jackson searched him and took his purse; that John Burgess was present, participating in the assault. The witness further testified that she immediately went first to the home of the Greens where her friend Pernie Swann was staying and communicated to Pernie what had happened and Pernie got out of bed, dressed in her blue jeans, put a butcher knife in her pocket and they returned to the house where Grace's father was on the bed, where Grace placed him after he was bludgeoned before she left the house to seek aid. The two girls, Grace and Pernie, then went to the home of the defendant Burgess and tried to arouse him and received no response. They then went to the home of Bill Nichols and informed him what had happened. Nichols thereupon got up and dressed and he and his wife got in the truck, taking the two girls who sat in the back of the truck, and carried them to the cross roads near the Payne home and let them out to go on back to the house, and then went by Burgess' home, Nichols getting out of his truck and arousing Burgess, who came to the door and said, "That you Bill", and Nichols answered in the affirmative and told him what had happened and to go on down there and aid the girls in taking care of the injured man. He and his wife went on to the home of Frank Payne, the son of the injured party, and returned in the truck with Frank Payne and his wife, stopping by Burgess' home and Burgess was still at home. Payne and Nichols told him again to get up and come on down to the Payne house. Nichols and his wife then went to get the doctor and when they returned Burgess and his wife had come to the Payne home and some of the testimony goes to show that Burgess sat in the front yard on some grass and did not go into the house. On this issue of fact the evidence was in conflict. There was testimony to the effect that defendant stated to one or more persons that he did not intend to go to the Payne home until some responsible person like Bill Nichols was present.

The evidence goes to show that the defendant Burgess and Andrew Jackson, the alleged accomplice, were not flushed in funds and were seeking work. One Williams testified that defendant about six months before deceased was killed, made the threat that he would cut deceased's head off; that defendant had stated on numerous occasions prior to the time deceased was killed that deceased had an "old rusty fruit can full of money." There was evidence of other threats made by defendant against Payne. The defendant admitted on his trial that he made the statement about deceased having money, but asserted this was a mere joke, that he didn't know who had money.

Mrs. Margaret Freeman, the wife of "Fiddling Tom", and other witnesses testified that they had heard the defendant state that Jackson was sent to Green's

house on the night of the killing and that he (Burgess) listened to the conversation and heard every word that was said in the Green house that night. This evidence tends to show a conspiracy and that Burgess and Jackson were at the Green home principally for prefabricating evidence of an alibi, which was his only defense.

There is no question that Burgess and Jackson were at Burgess' house immediately before Jackson went to the Green home and shortly after Jackson left the Green home the fifteen year old girl Pernie testified to hearing a noise, expressing it in her language,—"a great lumberment at Uncle Tom Payne's house" and several shots were fired from a gun. Soon thereafter Grace appeared at the Green home and communicated to her what had happened and asked Pernie to go with her.

The evidence shows that Payne, the deceased, had a double barrel shotgun which he kept in the front room, "the fire place room", as some of the witnesses expressed it, on the gun rack, unloaded, but this gun was found after he was bludgeoned under his bed loaded and shells were found in his pockets, evidence going to show that he anticipated trouble. There was evidence that the gun had not been fired.

On the morning after the bludgeoning of Payne, Andrew Jackson was found at the home of his kinsman Mr. Hudson with a hangover and with his face all scratched and lacerated and there was evidence going to show that a "bump" or contused wound was observed by some of the witnesses on the defendant's head the day following the assault on the deceased.

The evidence shows without dispute that the assault on the victim occurred in Cullman County before the finding of the indictment and that he died as a result thereof in that county.

There was also evidence offered of threats made by the defendant against the deceased and of defendant stating that he had had some trouble with "Uncle Tom" about defendant cutting trees around the spring from which the deceased obtained his water. And there is evidence tending to show that the deceased upbraided the defendant about his attentions to Grace.

The evidence goes to show that early in the day of July 14th the injured man was removed to the hospital and that Grace Payne with her household effects was moved to the home of the brother, that in the meantime Frank Payne, the son, was away from home looking after the father and after his death attending his burial and while Burgess came in contact with Grace Payne on several occasions when other persons were present, she did not make known to her brother the fact that the defendant Burgess was one of the parties guilty of participating in the assault until after the funeral. In the meantime Burgess was heard to say to Grace in a very audible voice accompanied by a motion of his hand to his own throat, "It's a wonder they didn't cut your head off", or words to such effect.

On an occasion in February prior to the assault on the deceased, when deceased was repairing a chimney for the defendant, defendant went to the home of the deceased where the deaf-mute daughter was alone to procure a brace and bit and remained away for a considerable time. Defendant's counsel asked him on direct examination while he was testifying in his own behalf the following questions with the following results:

"Q. I'll ask you, Mr. Burgess, if at any time there you touched Grace? A. No, sir.

"Q. I'll ask you whether or not while you were there you had a butcher knife? A. No, sir."

In reference to the same time, place and occasion the solicitor asked the defendant on cross-examination, "There at that time and place on that morning, did you have intercourse with Grace?" The defendant's counsel objected on the ground that "it is highly prejudicial." The court overruled the objection and the defendant answered, "No, sir, I didn't touch her.

"I'll ask you whether or not you didn't forceably have intercourse with Grace Payne?

"No, sir."

The defendant's counsel on direct examination, having brought into the trial evidence that the defendant was in the house of the deceased alone with the deaf girl and that he "did not touch her", the state had the right to ask the defendant on cross-examination the questions above set out and the court did not err in overruling the defendant's objections thereto.

It is familiar law applicable to both civil and criminal trials, that where one of the parties brings out a part of a transaction or conversation the other party has a right to show the entire transaction "although it may not be admissible as independent testimony." Chandler v. Goodson, 254 Ala. 293, 48 So. 2d 223, 226; Allen v. State, 134 Ala. 159, 32 So. 318; Vinson v. State, 10 Ala.App. 61, 64 So. 639; Evans v. State, 15 Ala.App. 383, 73 So. 562, Id., 198 Ala. 689, 73 So. 999. Moreover, the scope and extent of the cross-examination of the accused was within the sound discretion of the trial court, not reviewable except for abuse. Chandler v. Goodson, supra; Pynes v. State, 207 Ala. 413, 92 So. 666; Cox v. State, 162 Ala. 66, 50 So. 398.

We have examined the numerous rulings of the court on questions of evidence and find nothing further that requires treatment. The rulings were free from reversible error.

After due consideration it is our judgment that the evidence adduced on the trial required the submission of the issues in the case to the jury and that the court did not err in overruling the defendant's motion to exclude all the evidence nor in refusing the affirmative charge requested in writing by the defendant.

We note that in the court's oral charge to the jury, the court stated: "The Grand Jury of this county returned this indictment against this defendant, charging him with first degree murder. First degree murder ordinarily carries with it one of two punishments: the death penalty, or life imprisonment. But in the beginning, it has been agreed between the State and the defendant that a special jury would be waived in this case, and that the death penalty would be waived in this case; so there has been arrangements made so that you do not have before you the death penalty in this case, in the event you find the defendant guilty. I will explain to you what your verdict will be with reference to punishment at a later time in this charge, but I will state at the outset that the death penalty has been taken out of the case by agreement between the State and the defendant, and that agreement was that each side gave a little in that agreement, because ordinarily we would have to summon not only the group you were selected from, but there would have to be quite a few more jurors selected, and it would be expensive, and it was the idea of the State, and of the defendant to make that agreement. I instruct you in the beginning that that agreement which has been made, and is on record in this case, is not a fact which should be considered against either of the parties; it should not be considered in favor of either the State or the defendant. It has nothing in the world to do with what the outcome of this case should be. I tell you that merely to explain why you are not dealing with the death penalty in this case, as is ordinarily the case when you have a first degree murder case."

We are of opinion that this sets a precedent which should not be followed. The effect of the charge was not to *nolle prosse* the indictment for murder in the first degree but to suspend the application of the statute by an agreement between the parties, contrary to the provisions of the statute that, "Any person who is guilty of murder in the first degree, shall, on conviction, suffer death, or imprisonment in the penitentiary for life, *at the discretion of the jury*". Code of 1940, Tit. 14, § 318. Such agreement is also in violation of the constitution which inhibits the suspension of laws except by the legislature. Constitution of 1901, § 21. The appellant however was not injured and has no grounds on which to complain.

The oral charge of the court was otherwise a full, clear statement of the applicable law and in connection with the special

written charges, given at the defendant's request, embodied every principle and rule of law to which defendant was entitled. In fact no insistence is made that the court erred in refusing any of the defendant's requested charges.

We are further of opinion that the motion for new trial was overruled without error.

The jury returned a verdict finding the defendant guilty of murder in the second degree and fixing his punishment at imprisonment in the penitentiary for twenty-five years.

The judgment entered on the record after reciting the verdict is as follows:

"Thereupon the defendant being personally present in open Court, was asked by the Court if he had anything to say why the sentence of the law should not be pronounced upon him, and he said nothing.

"It is therefore considered and adjudged by the Court that the said defendant, John Burgess, be and he is hereby sentenced to hard labor for the County of Cullman for the term of Twenty-Five (25) years, the punishment fixed by the jury in this case for his offense."

This judgment of sentence is void and the same will be reversed, set aside and vacated and the cause remanded for an appropriate sentence.

There being no error on the record up to and including the judgment of conviction, the same is affirmed. Minto v. State, 9 Ala.App. 95, 64 So. 369.

Affirmed in part and reversed and remanded in part.

Judgment of conviction is affirmed and the judgment of sentence set aside and the case is remanded for proper sentence.

LIVINGSTON, C. J., and FOSTER and SIMPSON, JJ., concur in the opinion, except as to the statement that the agreement and charge as to the penalty of death was a suspension of the statute, which conferred on the jury the discretion to fix such penalty.