THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KHALID BASEER, Defendant-Appellant.

First District (1st Division)    No. 79-1029

Opinion filed November 17, 1980.

Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Thomas J. Leanse, and Paul D. Kerpan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Khalid Baseer, also known as Arthur Stanley Goins, was charged with the offense of rape. Following a jury trial, defendant was convicted and sentenced to eight years' imprisonment. Defendant appeals, contending (1) he was not proved guilty beyond a reasonable doubt; (2) the State's cross-examination and closing arguments concerning his religious beliefs were improper and prejudicial; (3) his sentence was excessive; and (4) the trial court erred by failing to specify the reasons for its sentencing determination.

The State's evidence revealed the following facts: Defendant and

Lillian Goins were married from 1969 until their divorce in 1974. They had two children, but one boy died in infancy. After his death, the couple separated and were eventually divorced. On April 10, 1978, Lillian lived in Chicago with her two children. Since their divorce, she only saw defendant once or twice a year when he visited their daughter. Recently, defendant had been visiting more often. The complainant, Lillian's 17-year-old sister, was there several times when defendant visited. About two weeks prior to April 10, 1978, defendant came over to Lillian's home and asked Lillian what happened the night their baby died, when she allegedly left the baby alone by a window and the baby froze to death. She told defendant to leave. The baby died in 1972 from pneumonia. On April 10, 1978, complainant was babysitting at her sister's house. The children were at school. At about 11 a.m. or 12 noon, defendant and a friend came to the house looking for Lillian. They sat at the kitchen table and defendant and his friend drank beer. Complainant did not drink any beer. After about 20 minutes, defendant and his friend left.

At about 2 p.m., defendant returned. He sat at the kitchen table and drank beer. He asked complainant if she wanted any beer or cocaine and she said no. Defendant then asked, "Do you think I'm here to try to run a game on you if you get high?" Complainant understood him to mean did she think he would try to pull something over on her. She did not answer. He then said, "Something had to go in and come out and a woman is here for things to come out." Complainant responded that she didn't want to talk about it. Defendant then asked, "If you're not here for that, what do you like to do?" She replied that she liked to swim. Defendant said, "Let's go swimming." When complainant said she did not have the time, defendant replied, "Well, you can swim in the bathtub." Complainant said nothing. Defendant went upstairs to use the bathroom and upon his return said, "I have the water running in the tub so I can see you swim." A few minutes later she went upstairs and turned the water off.

On her way downstairs, defendant blocked her passage and said, "Excuse me, I want to talk to you." She stated, "You can talk to me downstairs." When she tried to walk around defendant, he grabbed her by the waist and dragged her up the stairs to her sister's bedroom. Defendant pushed her into the room. When she told him to leave, he pushed her into the dresser. Complainant told him to stop, and asked him to leave. Defendant began grabbing at complainant's blue jean shorts and eventually succeeded in pulling them down. She fell to the floor and he put his knee on her stomach. She started crying and felt pain because she had recently been hospitalized for a bladder infection.

Defendant then threw her on the bed and pinned her arms under her body. He had sexual intercourse with her and babbled, "Be mine, be mine, do you hear me." Because complainant kept her face to the side and

would not look at defendant, he grabbed her throat, causing scratches and bruises.

Minutes later, someone knocked at the front door. After this person left, complainant's nephew returned from school and came upstairs. Defendant grabbed his pants and shut the door. Complainant remained on the bed crying. When her nephew opened the door, she told him what happened. Defendant then said, "I didn't do anything to you, don't lie on me like that."

Complainant attempted to phone her mother at work. She reached Ronnie Bullock, her mother's co-worker. They talked for only a few seconds, when defendant grabbed the phone and said, "This is Abul. I was only playing with her." He unplugged the phone and then left. When complainant plugged the phone back in, defendant called her three times and she hung up on him each time. Thomas Montgomery, her sister's boyfriend, called and she told him about the rape. She then called her mother, informed her about the rape, and upon her mother's advice called the police. When complainant talked to her mother, she also told Bullock she had been raped. The police arrived and shortly thereafter the police arrested defendant at his home.

The investigating officers witnessed complainant's neck injuries. At defendant's home the officers told him that complainant alleged he had raped her. Defendant responded that he didn't do anything. At the station, the officers asked defendant if he raped complainant. He stated that he did not and that he hadn't touched her. Defendant told another officer that complainant consented to have sex with him.

Defendant testified that he changed his name for religious reasons, and that his previous name was Stanley Goins. He had known complainant the past 10 years, and their relationship was friendly. After his divorce, complainant became more and more suggestive. On one occasion, she invited defendant over and had him take photos of her. On other occasions, she made sexual advances to defendant. He always tried to maintain a respectful attitude toward her.

On April 10, 1978, at about noon, defendant and a friend visited Lillian's home. Complainant drank beer with them for about a half an hour. Defendant and his friend left, but defendant returned alone at about 2 p.m. Complainant and defendant sat in the kitchen and talked. Complainant asked defendant if he was interested in having sex with her. He asked her in what way she enjoyed sex, and she responded, "She liked it when it's wet." Defendant then went upstairs to the bathroom and turned on the bath water.

Defendant returned to the kitchen, and they continued to discuss sex. Complainant went upstairs to turn off the water and defendant accompanied her. Defendant put his arm around complainant and asked her if she was

serious about having sex with him and she said yes. At this point, complainant voluntarily went into the bedroom. They had sex and complainant offered no resistance, but remained passive and quiet. They were interrupted by a knock at the door by a child looking for complainant's nephew. Complainant, talking from the bed, told the child her nephew was not home. A few minutes later, while defendant was in the bathroom, complainant's nephew came home. He entered the bedroom and talked to complainant.

Defendant corroborated complainant's account of her phone call to Bullock. After this call, defendant went to his mother's house one block away. He called complainant three times and she hung up each time. Defendant admitted that when the police officers arrived, he told them nothing had happened and that he didn't have sex with complainant. Defendant testified that the rape charge was a conspiracy arranged by his ex-wife and complainant.

Defendant contends that this evidence is insufficient to prove his guilt beyond a reasonable doubt. Specifically, he argues that the rape victim's testimony was inconsistent and that she had ample reason to fabricate her account.

The testimony of the complainant alone is sufficient to sustain a conviction for a sex offense where her testimony is clear and convincing, even though contradicted by defendant. (*People v. Saffold* (1977), 47 Ill. App. 3d 934, 365 N.E.2d 524.) In rape cases, reviewing courts must carefully examine the evidence; however, they should not encroach upon the function of the trier of fact to weigh credibility and otherwise assess the evidence. *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.

Defendant points out the following inconsistencies in complainant's testimony: (1) complainant told the police that defendant accosted her as she was going upstairs to turn off the bath water; however, at trial, she testified that this occurred as she was going down the stairs; (2) on direct examination, she testified that she was on the bed when defendant removed her clothes, but on redirect, she stated that she was on the floor; (3) on direct, she testified that she called her mother to report the rape, but she told the police that her mother called her; and (4) she testified that she did not attempt to escape from the bedroom by burning defendant with a cigarette, but later testified that she tried to escape in this manner. ■■ In our view, these inconsistencies are minor in nature. Minor discrepancies affect only the credibility of the witness and the weight to be given her testimony. (See *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.) A court of review will not substitute its judgment for that of the trier of fact as to witness credibility. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L.

Ed. 2d 533, 98 S. Ct. 1513.) We have carefully reviewed the record and find complainant's testimony both clear and convincing. Moreover, we note that defendant also made several inconsistent statements. The jury was in a superior position to assess credibility and apparently rejected the consent defense. The evidence supports their determination.

■■ In addition, a timely complaint of rape constitutes evidence of the commission of that crime. (*People v. Armstrong* (1976), 43 Ill. App. 3d 586, 357 N.E.2d 84.) Complainant's rape outcry was first received when Thomas Montgomery, her sister's boyfriend, phoned and immediately thereafter by Ronnie Bullock and complainant's mother. Complainant then reported the rape to the police. The jury may also have inferred that she would have told Bullock about the rape during their first conversation if defendant had not interrupted. All these phone conversations happened a few minutes after the incident. Moreover, complainant immediately went with the police and identified defendant as the rapist. An officer noticed that she was nervous and had bruises on her neck.

Finally, defendant asserts that complainant might have complained of being raped after the incident because of her desire to explain the embarrassing position in which she had been found by her nephew. Defendant maintains that to avoid the opprobrium which would be caused by her sister's knowledge of her consenting to sex with defendant, complainant unjustly accused defendant of rape. However, at trial defendant testified that his ex-wife and complainant were engaged in a conspiracy to charge him with rape. This suggests that his ex-wife knew of her sister's alleged consent. In any event, the record is devoid of evidence of either a fabrication by complainant or a conspiracy.

Defendant's second contention is that the following cross-examination of defendant regarding his religious beliefs was improper:

"Q. [by State's Attorney] So from your perspective you were successfully seducing or seduced by a seventeen year old?
A. [by defendant] Yes.
 *  *  *
Q. Does that come within the restrictions of your new religious convictions?
A. No.
MR. MIRANDA: Objection.
THE COURT: Sustained.
MR. LEONE: And you were converted religiously to—
MR. MIRANDA: Ask the question and answer be stricken.
MR. LEONE: When was your conversion, in 19--
A. I became a Muslim in 1976.
Q. So how do they feel about pre-marital extra-marital sex?
A. There is a firm stand against that.

Q. Okay, did you perceive this act to be weakness in your person that you were unable to withstand this temptation?

A. Yes."

Defendant also complains that the State's closing comments regarding this testimony were improper:

"The same fact is this guy's been telling, he's whatever they are, about religion with this girl's sister and about the girl and this guy on the stand, the temptress, since thirteen has been seduced the now newly reformed rigid Muslim, not fornicating, not drinking, name change, denounces the old ways of living, religious man I believe was the phrase that the Defense Counsel used and one day in April, April 10, 1978, he broke down and gave in to a temptress whose been after him for the last four years."

Evidence of a witness' religious beliefs or opinions is not admissible for the purpose of impairing or enhancing his credibility. (*Starks v. Schlensky* (1906), 128 Ill. App. 1.) However, on direct examination defendant testified:

Q. Would you state your name please?

A. Khalid Baseer.

\* \* \*

Q. Have you always been known by that name?

A. No. I changed my name in 1976 for religious reasons and purposes.

Q. Okay and before that you were what?

A. Arthur Stanley Goins.

Q. What year did you change your name?

A. In 1976."

■■ Where the admission of evidence is procured, invited or acquiesced to by the defendant, even though such evidence is improper, defendant cannot complain upon appeal. (*People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U. S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651; *People v. White* (1974), 25 Ill. App. 3d 391, 323 N.E.2d 376.) Here, defendant opened the door to further questioning by the State concerning his religious beliefs. On direct examination, defendant did not have to state the reasons for his name change. By doing so, he allowed the jury to infer that his new religion bore favorably on his credibility. Because defendant initiated this inquiry, he cannot now complain that the State attempted to demonstrate negative inferences concerning his new religion. Moreover, because the State's cross-examination was proper, its closing remarks constituted fair comment on the evidence. Defendant was not prejudiced.

Defendant's third contention is that his sentence of eight years for rape was excessive. He submits that he should have received the mini-

mum sentence of six years. The imposition of a sentence is clearly a matter of judicial discretion. Absent an abuse of this discretion, a reviewing court will not alter the sentence imposed. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882, *reaffirmed in People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

The trial court received the presentence report and considered matters in aggravation and mitigation. Factors argued in aggravation were (1) complainant's age (17); (2) her status as the sister of defendant's ex-wife; (3) complainant's throat injuries; (4) defendant's prior theft conviction and probation sentence; and (5) defendant's motive of revenge against his ex-wife because she allegedly contributed to their son's death from pneumonia. We also note that, although defendant did not use a weapon, the crime of rape is inherently a violent attack and defendant also grabbed the victim's throat and pressed his knee into her stomach.

In mitigation, defense counsel pointed out: (1) defendant's age (34); (2) his good educational and work records; (3) the lack of prior sexual attacks or history of violence; and (4) the fact that the victim suffered no serious physical injuries.

■■ Balancing these factors, we cannot say that the trial court abused its discretion by sentencing defendant to only two years beyond the minimum for rape.

Defendant's final contention is that the trial court erred by failing to specify the reasons that led to his sentencing determination. Section 5—4—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1(c)) provides in pertinent part:

> "In imposing a sentence for a felony, the trial judge shall specify on the record the particular evidence, information, factors in mitigation and aggravation or other reasons that led to his sentencing determination. * * *."

At the time he pronounced sentence, the trial judge stated:

> "THE COURT: The statute at the time of this offense provides that the offense of Rape for which the jury found you guilty is a class X offense, not probationable. The range of penalties is under a determinant sentence which means that I'll sentence you to a single term of years rather than a minimum and maximum in a range of six to 30. *I have considered the matters urged both in aggravation and mitigation and will sentence the Defendant to eight years in the Illinois Department of Corrections."* (Emphasis added.)

By not stating explicit reasons for defendant's sentence, the trial court did not comply with section 5—4—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—4—1(c)). Defendant relies upon *People v. Rickman* (1979), 73 Ill. App. 3d 755, 391 N.E.2d 1114, where

the court held that violation of this provision required the sentence be vacated and a new sentencing hearing held.

■■ We find, however, that this issue has not been preserved for review. Defense counsel made no request for a statement of the court's reasons, nor did he make an objection or include this issue in his post-trial motion. Regarding the identical issue, this court stated in *People v. Taylor* (1980), 82 Ill. App. 3d 1075, 1078, 403 N.E.2d 607, 610:

> "If defendant had objected to the court's failure to include the statement, the error could have been corrected immediately and the need for an appeal avoided. It is clear that the statute entitles defendant to a statement and that it would be error for the court to refuse to make a statement if requested. However, we find that defendant's failure to present the question to the trial court and thereby allow it to supply the omitted statement should preclude him from urging the issue on appeal. (*People v. Trefonas; People v. Carraro* (1979), 77 Ill. 2d 75, 394 N.E.2d 1194.)"

In *People v. Meeks* (1980), 81 Ill. 2d 524, 411 N.E.2d 9, defendant argued that her presentence report was insufficient because it omitted reference to sentence alternatives or community programs to assist in defendant's rehabilitation. Our supreme court acknowledged this deficiency, but ruled that "any objections to the sufficiency of the report must first be presented to the trial court." (81 Ill. 2d 524, 533.) Similarly, defendant herein has waived this issue.

In any event, *People v. Taylor* did not follow the holding of *People v. Rickman. Taylor* noted that the purpose of the provision was to provide reviewing courts an accurate basis for sentence review and found that, absent any showing of prejudice to defendant, a remand for resentencing is not required. We have determined that defendant's sentence was not excessive. Accordingly, defendant was not prejudiced by the failure of the trial court to provide his sentencing rationale.

For the aforementioned reasons, the judgment and sentence of the circuit court of Cook County are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.