THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DENNIS SZUDY, a/k/a Anthony Peplinski, Defendant-Appellant.

First District (5th Division) No. 80—3044

Opinion filed August 13, 1982.

Ralph Ruebner and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Michele A. Grimaldi, and Kim R. Kardas, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial defendant, Dennis Szudy, was convicted of rape and unlawful restraint (Ill. Rev. Stat. 1975, ch. 38, pars. 11—1, 11—3) and sentenced to 18 years' imprisonment on the rape charge. On appeal, defendant contends that (1) the trial court committed reversible error in allowing the State to elicit testimony that the complaining witness had identified defendant's photograph out of a book at the police station, thereby indicating to the jury that defendant had a prior criminal record; and (2) defendant was not proved guilty beyond a reasonable doubt. We affirm.

The complaining witness, T.F., was 16 years old on March 24, 1978. On that evening she and a friend, Michael Browning, took public transportation to the Aragon Ballroom to see a concert. When they arrived they found that the concert was sold out, so they went next door to the Flamingo Cafe for several drinks. T.F. testified that they were asked to leave the cafe following an argument with a Spanish lady when Browning began to dance without his shoes. Browning testified that the lady did not strike T.F. and he denied telling a defense investigator otherwise.

T.F. and Browning left the cafe at 10 or 10:15 p.m. and started hitchhiking. A car with four males pulled up and let them in, Browning in the back seat and T.F. in the front. T.F. and Browning both identified defendant as the driver of the car.

When the automobile reached the 111th Street exit, where T.F. and Browning had asked to be taken, the driver drove on past and told them that Browning would be taken home first. They exited on 167th Street and Crawford and turned into a schoolyard where defendant told Browning to get out of the car. He was pushed out by the two males in the back seat and knocked to the ground. The car then sped off with T.F. inside.

Browning testified that he at first flagged down a car so he could look for the assailants' automobile but when he did not see it, he walked home. He did not call the police when he got there. He planned to call T.F. to see if she had returned home but instead fell asleep until noon the next day. He called a friend of T.F.'s that afternoon but did not speak to the police or T.F. until two days after the incident.

T.F. testified that after Browning was pushed out of the automo-

bile she started crying and the driver told her to get into the back seat. He told the men in the back to remove her clothing. She testified that they removed her clothes from the waist down. Each of the men in turn had sexual intercourse with T.F., while one man held her down at all times. After the third man had finished he told T.F. that the driver had a gun and would hurt her if she did not keep quiet. While the driver had intercourse with T.F., one of the passengers drove the car. Afterwards, the driver told T.F. to get into the front seat and he ordered the other three men to leave.

The driver and T.F. drove around for awhile and he stopped once in an alley to let her urinate. When they resumed driving he told her he was a "hit man" with the Mafia and stole cars. He asked her age and started to apologize because she was so young. He stopped the car and then had sexual intercourse with her again. She testified that she was crying and trying to stop him from raping her.

Once again they began to drive and T.F. eventually fell asleep for a time. When she awakened, defendant asked her where she would like to go and she told him 105th and Western. When he let her out of the car, he warned her to keep her "mouth shut" or he would "blow her and her mother away." She then ran to her boyfriend's house nearby.

Harold Reeve, T.F.'s boyfriend, testified that his father let her in and went back to bed. When Reeve saw her at about 7 a.m. on March 25, she was lying face down on the couch in his home, crying. He saw that she had a blackened and swollen eye. She told him that she had been raped and they talked awhile as he tried to comfort her. They left Reeve's house and went to breakfast.

T.F. testified that Reeve had paid for breakfast because she had no money. After breakfast, however, she bought a pair of sunglasses. Reeve testified that he did not pay for the sunglasses.

Reeve took T.F. home at noon, and she and her mother went to the hospital. There, T.F. spoke with two police officers and underwent tests and examination. Later, she identified a photograph of defendant from a book at the police station. On April 6, she identified defendant in a lineup.

T.F. further testified that the driver had struck her twice. She said that the others in the car had referred to him as "Dennis." In addition to her black eye, she said that she had a mark on her chest and mouth.

The examining doctor, Chowdary Adusmilli, testified that T.F.'s left eye was blackened and that the right side of her chest was bruised. He found no severe stretching of the labia, no injury to the

hymen, and no trauma to the vagina. Stipulated medical evidence indicated that human spermatozoa was present on the specimen slides taken from T.F.

The investigating officer, Robert Dudak, testified regarding his involvement in the case. He obtained an arrest warrant for defendant on April 4, 1978. On April 6, defendant surrendered himself to the police and a lineup was conducted. In Officer Dudak's report of the incident he had written that T.F. was completely undressed by her assailants.

Defendant, 36 years old, testified that he was alone when he picked up T.F. and Browning at approximately 11 p.m. The road was icy. The couple told defendant that they wanted to go to 175th and Crawford. Defendant testified that Browning was inebriated and that both were boisterous. T.F. complained that she was beginning to get a bruise from a fight that she had been involved in.

When they arrived at 175th and Crawford, Browning left them. T.F. said it was too late to go home. She asked defendant what they could do and then suggested that they stop. Defendant pulled into a schoolyard and they began kissing. T.F. asked defendant if he had any money and he gave her a $20 bill. She disrobed and they had sexual intercourse. They were in the schoolyard approximately two hours.

Defendant further testified that after they left the schoolyard, he drove north and T.F. slept. After she awakened, defendant took her to 103d and Clairmont, at her request. When they reached that destination she asked defendant to let her sleep for awhile because she was very tired. She slept in the car for 1½ to 2 hours and then left.

Defendant's brother-in-law, a police officer, told him about the arrest warrant and he surrendered himself to the police.

Erwin Karol, a retired police officer and an investigator for A.I.C. Security, testified that he spoke with Browning by telephone soon after the incident. Browning told him that T.F. received her bruised eye from a Spanish lady she had fought. On cross-examination, however, Karol admitted that his written report indicated that Browning had told him T.F. got the black eye from one of the men in the car. The report also indicated that Browning said T.F. was struck by the lady during an argument.

In rebuttal, Jose Cruz testified over defense objections. Cruz was a bouncer at the Flamingo Cafe on the night of March 24, 1978. He said that the neighborhood is rough and that the cafe caters mainly to Mexicans and Puerto Ricans. At 9:30 p.m. on March 24 a white male and female entered the cafe and ordered drinks. Cruz testified that the male was acting wild and jumping up and down. At one point

Cruz told him that he could not dance without his shoes. Twenty minutes later, he told them to leave the bar. He had not observed any fight or unusual disturbance involving the couple. They left but returned in a few minutes and asked to be let back in. It was raining and chilly outside. Cruz refused to let them return because the male was too drunk. The female was "so-so." He saw nothing unusual about her face.

The jury returned its verdict of guilty on both charges. Defendant's motion for a new trial was denied and he brought this appeal.

Opinion

Defendant initially contends that the trial court committed reversible error in allowing the State to elicit testimony that T.F. identified defendant's photograph from a book of photos at the police station. T.F., her mother, and Investigator Dudak all testified, over defense objections, regarding T.F.'s viewing of defendant's photograph. Such testimony, defendant believes, indirectly informed the jury of his prior criminal record, which the trial court had ordered excluded upon defendant's motion *in limine*. For support, defendant cites *People v. Murdock* (1968), 39 Ill. 2d 553, 237 N.E.2d 442, *People v. Denwiddie* (1977), 50 Ill. App. 3d 184, 365 N.E.2d 978, and *People v. Stover* (1982), 89 Ill. 2d 189, 432 N.E.2d 262. None of those cases, however, hold that reference to a victim's identification of defendant's photograph is reversible error. In *People v. Murdock*, the court recognized that the admission of the actual "mug shots" may suggest to the jury that a defendant has a prior criminal record and that, absent a probative purpose for their admission, such photos could result in error. However, the court expressly did not consider "whether or not such evidence alone would be so prejudicial as to require a new trial." (39 Ill. 2d 553, 562.) In contrast to the *Murdock* case, the present case does not involve the admission of the photographs themselves.

In *People v. Denwiddie*, the court noted that the admission of mug shots is not automatically reversible error and that such photographs were properly admitted in that case to prove a fact in issue, defendant's identity. In *Denwiddie*, the photographs bore police file numbers which were covered over with tags.

The recent decision of *People v. Stover* does not involve police photographs. There, the defendant, charged with obstructing a police officer, argued that the State improperly questioned the arresting officer as to his prior acquaintance with defendant. The Illinois Supreme Court agreed that the questioning was improper even though defendant's knowledge that the officer was in fact a police officer was an

element of the offense. The court noted that the officer had testified he was in uniform when he arrested defendant and therefore defendant's knowledge that the man was a police officer was already established. The court reversed the conviction on another ground and merely stated that under the circumstances of the case there was "no apparent reason why the prosecutor would inquire into defendant's previous acquaintance with [the officer] unless an implication of prior criminal activity was intended." The court concluded, "[w]e trust that on retrial such inquiry will not recur." 89 Ill. 2d 189, 196, 432 N.E.2d 262, 266.

■■ The cited authorities do not compel us to find that the questioning in the pending case is reversible error. The references to the photographic identification was unnecessary because defendant's identity was already established and not in dispute. Nevertheless, we do not find that the testimony was unduly prejudicial. In *People v. Long* (1978), 65 Ill. App. 3d 21, 23-24, 382 N.E.2d 327, we rejected an argument similar to the one that defendant makes in the pending case, stating:

"[T]he practice of showing photographs of suspects to witnesses is essential to effective law enforcement, [citation], and the use of police photographs for identification purposes has long been upheld. * * * [T]he police photographs were not received in evidence and were never described as 'mug shots' within the hearing of the jury. The jury did not examine the photographs or the album containing defendant's photograph. Defendant was not prejudiced by the testimony concerning the photographic identification nor does it appear that the jury improperly considered defendant's past criminal record. The testimony regarding the photographic identification did not deprive defendant of a fair trial."

As in the *Long* case, here the photos were never received into evidence or referred to as "mug shots." We conclude that defendant was not denied a fair trial by the references to the photograph.

Defendant next contends that his conviction must be reversed because the evidence against him is highly improbable and conflicting. He admits to having sexual intercourse with T.F., but not against her will. Arguing that the State's evidence regarding force was primarily the testimony of T.F. and Browning, defendant emphasizes certain supposed flaws and conflicts in their testimony.

■■■ ■ First, defendant questions Browning's failure to contact the police after being shoved out of defendant's car and witnessing his friend being abducted. Instead of summoning help, he went home

and went to sleep. Defendant infers from this that T.F.'s version of the incident is improbable. While we agree that Browning's inaction is puzzling, and the record contains no explanation of his behavior, we cannot say that his inaction creates a serious doubt as to defendant's guilt in light of all the evidence. Browning's failure to summon the authorities creates a credibility question for the jury to weigh. We cannot overturn a guilty verdict unless the proof is so unsatisfactory and unconvincing that it raises a serious doubt of defendant's guilt. (*People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99; *People v. Jenkins* (1980), 88 Ill. App. 3d 719, 410 N.E.2d 1145.) Moreover, a rape victim's testimony, standing alone, is sufficient to sustain a conviction if her testimony is clear and convincing (*People v. Baseer* (1980), 90 Ill. App. 3d 866, 414 N.E.2d 5), and minor discrepancies in her testimony do not render it unconvincing. *People v. Thompson* (1978), 57 Ill. App. 3d 134, 140, 372 N.E.2d 1052.

In the pending case, in addition to her testimony, there was corroborative physical evidence of a physical attack on T.F. She had a bruised and swollen eye and bruises on her chest. The jury resolved the conflict in the evidence as to the cause of those bruises in favor of T.F.'s version of the facts, that defendant struck her and that he and the others raped her.

T.F.'s informing Officer Dudak that she was fully unclothed, when she testified to being partially undressed, we believe, is a detail that does not seriously undermine her credibility. Nor do we find material her testimony of having no money to pay for breakfast, which was disproved by her subsequent purchase of sunglasses. Her purchase of sunglasses does not, as defendant claims, necessarily support defendant's claim that he paid her $20.

Defendant further questions T.F.'s testimony that defendant raped her a second time after apologizing to her because of her youth. Again, this is a matter for the jury to evaluate. Defendant's apology might have been motivated by surprise as to her age. By that time, however, T.F. had been raped four time and it is not so incredible as defendant implies that he would rape her again. Similarly challenged is T.F.'s testimony that she fell asleep during her ordeal. Defendant argues that this indicates her acquiescence in the sexual intercourse and her lack of fear of defendant. We cannot agree that defendant's inference is the only plausible one to be drawn; T.F. had been drinking before the incident and had been up all night. An ordeal as terrifying as gang rape, moreover, might well cause utter exhaustion in the victim.

Finally, defendant strongly relies on the medical testimony

that there was no indication of vaginal trauma, despite the victim's testimony that she had been raped five times. The State was precluded from eliciting expert opinion testimony as to the significance of the presence or absence of vaginal trauma in rape cases. We note from the record, however, that the doctor examined T.F. at 2 p.m. on March 25, 1978, at least eight hours after the last act of sexual intercourse; signs of redness or trauma that might have occurred could have faded by then. More important, the force element of rape does not depend for its proof on actual physical damage to bodily tissue, and no definite standard exists concerning the amount of force necessary to sustain a rape conviction. (*People v. Sims* (1972), 5 Ill. App. 3d 727, 283 N.E.2d 906.) Furthermore, a victim is not required to subject herself to serious physical harm by resisting in order to establish that intercourse was nonconsensual. (*People v. Sims.*) We conclude that the absence of noticeable vaginal trauma, especially several hours after the rapes occurred, does not inject such doubt of defendant's guilt as to require reversal of the jury's verdict.

The State's evidence indicates that T.F. was forcibly abducted, raped, threatened, and struck by defendant. Following her release after several hours in captivity, she went to her boyfriend's house, crying, to tell him what had occurred. Despite defendant's threat against her and her mother, she did report the rapes to her mother after a few hours. Finally, her face and chest had been bruised. The jury chose to believe her testimony. We agree that the evidence of force was sufficient to prove defendant guilty as charged beyond a reasonable doubt.

As a final consideration, the State urges us to remand the case for a sentencing determination on the unlawful restraint charge. The trial court found, in effect, that this offense merged with the rape conviction and held that there would be "no purpose in imposing a sentence on the unlawful restraint charge." The State did not object to this or ask the court to impose a separate sentence and did not file notice of a cross-appeal, but simply added its argument on this issue in its brief. We therefore hold that the point is waived and that the sentence shall remain as set by the trial court.

We affirm the trial court's judgment for the reasons set out above.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.