JUSTICE SULLIVAN
 

 delivered the opinion of the court:
 

 After a bench trial, defendant was convicted and sentenced to eight years for rape. He contends on appeal that (1) he was denied his constitutional right to confront witnesses against him because the complaining witness could not be adequately cross-examined; (2) the trial court erred in allowing the State to establish the elements of the crime by asking leading questions of the complaining witness; and (3) he was not proved guilty beyond a reasonable doubt.
 

 At trial, Edith McConnell (Edith), the 13-year-old sister of the complaining witness Diane McConnell (Diane), testified that when she left for school on the morning of September 16, 1981, Diane was in the apartment and the house was neat. When she returned home between 4 and 5 p.m., a chair in the kitchen was overturned, the couch cover and pillows were on the floor, and the radio and television were playing loudly. Diane was shaking and appeared frightened, her hair was in disarray, and her nightgown was open. Diane, who is mute, indicated by gestures that she had been raped. When asked what happened, Diane pointed to her vaginal area, west toward the Cabrini-Green housing project, then to her (Edith), then to her (Diane’s) child who was in the apartment with her. She (Edith) asked if Diane meant that a boy had done this to her and that he was one of her (Edith’s) friends from the project, and Diane nodded her head yes. Diane then pointed east toward her own apartment, and she (Edith) asked whether the boy was one who had accompanied her to Diane’s apartment; Diane nodded yes. Edith explained that she went to Diane’s apartment with defendant a few days earlier to pick up Diane’s child, and Diane saw defendant at that time. She had never taken any other boy to Diane’s apartment. Edith further testified that Diane indicated to her through gestures that defendant gained admittance by knocking on the door and asking for her (Edith). The police took Diane to the hospital, and while she (Edith) was alone at approximately 8 p.m. she heard a knock on the door, peered out, and saw defendant standing on the porch. Two officers approached him and, when defendant tried to flee, a struggle ensued during which defendant dropped a gun and then ran away. Edith also testified that Diane is 31 years old and lives in her own apartment with her child and boyfriend and is able to move about the neighborhood by herself.
 

 When Diane McConnell was called to testify, the trial court explained for the record that because of her inability to speak, Diane would be using a blackboard containing letters of the alphabet, numbers, colors, picture symbols for simple concepts such as house, and anatomically correct dolls in testifying. Diane then indicated through gestures, pointing to the board, and reenactment using the dolls, that she was at her mother’s apartment with her son on the afternoon of September 16 when she heard a knock on the door. When she opened it, defendant entered and asked to see Edith, but she (Diane) indicated to him that Edith was not home. Defendant then pushed her onto the couch and had sexual intercourse with her; the intercourse was against her will. She further indicated that defendant was wearing a gray coat and a hat, but she could not give any clear, consistent answers when asked what time defendant arrived and left or how long he stayed, and gave conflicting answers on how she was dressed at the time and whether she had seen defendant prior to the incident. Upon further questioning, Diane demonstrated her understanding of the difference between intercourse and rape by making pushing and choking gestures when asked to explain the distinction.
 

 Brandy Brown testified that she lived next door to the apartment where the rape occurred and was acquainted with Diane. Between 1:30 and 2 p.m. on the date in question, she heard Diane’s son screaming, then the volume on the television set in that apartment was turned up very loud. At about 3 p.m., she (Brown) went out to get her mail and saw Diane standing in the doorway of her apartment. She asked Diane what was wrong because she looked upset, dazed, and her eyes were watering, but Diane did not respond. Later, Edith told her that Diane had been raped, and when she (Brown) went next door, she noted that there were chairs overturned and the couch cover was on the floor.
 

 Officer Jones testified that when he arrived at the scene, the apartment was disheveled and Diane appeared to be in shock. He transported her to the hospital, then went to defendant’s apartment and told his mother the police wished to speak to him. Defendant came to the police unit in Cabrini-Green at 10:40 that night and was wearing, among other items of clothing, a gray sportcoat and a cap.
 

 Detective Stabnick testified that she interviewed Diane at the hospital that night with the aid of Brown, who acted as an interpreter because she (Stabnick) could not understand Diane’s gestures. During this interview, Diane indicated that defendant raped her. Stabnick further testified that she and her partner went to the apartment where the rape occurred at approximately 9 p.m. that night and, as they approached, they saw defendant standing at the door and asked his name. Defendant fled, but there was no struggle and defendant did not drop a gun.
 

 It was stipulated that tests conducted on Diane at the hospital were positive for the presence of spermatozoa.
 

 Ernestine Gideon, a defense witness, testified that defendant came to her apartment at approximately 10 a.m. on the date in question and, after speaking to her for 15 minutes, went next door to visit his girl friend. Defendant returned to her apartment for 15 minutes at noon, then went back to his girl friend’s home. She saw him again at 3 p.m., but did not know where he was in the interim. Gideon further testified that her apartment is less than one block from the apartment where the rape occurred.
 

 In rebuttal, it was stipulated that shortly after being taken into custody and after being read Miranda warnings and acknowledging his understanding of them, defendant stated to an assistant State’s Attorney that he knew Diane and Edith; that he went to their apartment at 2 p.m. on the date in question looking for Edith; that when Diane indicated that Edith was not home, he left and returned to his apartment; and that he knocked at their apartment door at approximately 9:30 that night “looking for a haircut” but fled when he saw the police.
 

 Defendant testified in surrebuttal that he did tell officers he stopped at Diane’s apartment, but denied telling them what time he was there. He further stated that he arrived at the apartment at 9 a.m. but only stayed two or three minutes and did not touch Diane. From there, he went to Gideon’s house and stayed until 9 p.m. As he was passing near Diane’s apartment on his way home, two officers attempted to stop him, and he ran because he thought they would arrest him for a curfew violation, although he acknowledged that he was 17 years old at the time and it was only 9 p.m. He explained that officers frequently harassed young men out after dark in the area surrounding the housing project. When he arrived home, he learned that the police wanted to speak to him, and immediately went to the police unit in the project. Defendant admitted that he met Diane before the date in question but denied raping her.
 

 Opinion
 

 Defendant first contends that he was denied his right to confront witnesses against him because the complaining witness’ mild to moderate retardation and inability to communicate verbally prevented him from cross-examining her adequately. In support thereof, he cites People v. White (1968), 40 Ill. 2d 137, 238 N.E.2d 389, wherein the sole witness to a theft was a nursing home patient who could hear but could not speak. In reversing the defendant’s conviction, which was based solely on her testimony, the court noted that there were “grave doubts” as to the witness’ competency and susceptibility to influence, and that the only way she could communicate was to raisé her knee if her answer was yes, and remain still if her answer was no. The court further stated that “[t]he witness had no means of originally communicating an accusation. She was unable to state what she saw nor could she describe the [article stolen] or the person who took it.” (40 Ill. 2d 137, 139, 238 N.E.2d 389, 390.) The court ruled that, under those circumstances, the defendant’s right to cross-examine the witness was violated. .
 

 It is defendant’s position that the instant case is similar to White, relying on a letter from Dr. Kaplan, a staff psychiatrist at the Psychiatric Institute of Cook County, who examined Diane and expressed his opinion that she was on the borderline between mildly and moderately retarded. Kaplan further stated that while Diane was able to communicate “a reasonably adequate description of the alleged crime,” when questioned thereon she “gave confusing and conflicting responses,” and it was therefore his impression that she “would not be able to be adequately cross-examined in court.” Defendant also relies on the trial court’s statement at the close of trial:
 

 “It should be noted, at this time, that the victim *** is a mild to moderate retarded adult who cannot talk or use a known sign language. She can understand questions. And when questions are phrased in a simple forthright way, she can answer them by referring to a board, which contains all the alphabets, numbers, days of the week, months, and so forth. It should be noted that she can best answer leading questions, which call for a yes or no answer. Compound questions will either not be answered, or the answer may be confusing. Questions that call for a verbal response are beyond the ability of the victim to answer, and tend to frustrate her. *** The direct and cross examination of the victim took most of an afternoon, and she seemed to tire out towards the end. So that her alertness was better at the start than at the end.”
 

 Defendant argues that the foregoing shows that he could not adequately cross-examine Diane because she was less alert, and therefore inattentive, during the examination. He further contends that her inability to speak made it difficult to discredit her and that the trier of fact was less able to observe her demeanor.
 

 We find the circumstances of this case described by defendant readily distinguishable from White. Initially, we note that the trial court conducted pretrial hearings regarding her competency to testify (no transcripts of which were provided) and had considered Dr. Kaplan’s opinion, but reserved ruling on her competency until after she had testified. In ruling that she was competent, the court specifically relied upon the criteria set forth in People v. Seel (1979), 68 Ill. App. 3d 996, 1004, 386 N.E.2d 370, 376; that is, it determined that she had the “ability *** to receive correct impressions from [her] senses; [the] ability to recollect these impressions; [the] ability to understand questions and express answers; and [the] ability to appreciate the moral duty to tell the truth.” This determination is within the sound discretion of the trial court, and may be arrived at either through conducting a preliminary inquiry or observing the witness’ demeanor and ability to testify during trial (People v. Luigs (1981), 96 Ill. App. 3d 700, 421 N.E.2d 961) and will not be disturbed absent a showing that it abused its discretion (People v. Fugate (1979), 77 Ill. App. 3d 103, 395 N.E.2d 1199).
 

 Here, while defendant does not expressly purport to challenge the trial court’s ruling as to competency, he implicitly attacks that ruling by his reliance on White, wherein the court expressed “grave doubts” about the witness’ competency, as well as his reliance on the facts that Diane was retarded; that a psychiatrist found her answers “confusing and conflicting”; and that Diane appeared to tire toward the end of her testimony. However, these facts are immaterial to the question of competency. We have repeatedly held that a witness suffering from mental impairment such as retardation (People v. O'Neal (1977), 50 Ill. App. 3d 900, 365 N.E.2d 1333) or senility (People v. Scott (1982), 108 Ill. App. 3d 607, 439 N.E.2d 130) is legally competent to testify so long as he has the capacity to observe, recollect, and communicate. Thus, defendant may not rely merely on the fact that Diane was retarded; she is presumed competent, and he has the burden of showing that she was not. (People v. Davis (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) In this regard, defendant points to nothing in the record from which we could conclude that her mental capacity affected her legal competency; to the contrary, Diane’s ability to remember details, such as defendant’s clothing, what he said, what he did, and to communicate those facts despite her handicap, clearly support the trial court’s determination.
 

 It is further our view that defendant’s reliance on Dr. Kaplan’s opinion that Diane could not be adequately cross-examined because her answers were sometimes “confusing and conflicting” is misplaced. That is not the test of competency, as we recently noted in People v. Scott (1982), 108 Ill. App. 3d 607, 610, 439 N.E.2d 130,133:
 

 “The record indicates that although the complainant’s testimony was at times unresponsive and confusing in response to questions asked of him, he had the capacity to observe, recollect and communicate. Thus, he was competent to testify and any inconsistencies in his testimony merely affected his credibility and the weight to be accorded his testimony.”
 

 In the instant case, the conflicts and inconsistencies noted in the record go to relatively minor matters. It is apparent that Diane has difficulty with time concepts; that is, she became confused when asked what time something happened or how long someone was present. She also had difficulty answering questions which were phrased in the negative; when asked if she had seen defendant on a prior occasion, she would say yes; when asked “you never saw defendant before” she would answer no. Under those circumstances, it is difficult to tell whether she was answering the question or expressing her agreement with the idea contained therein. However, as noted in Scott, these problems go to her credibility, not her competency.
 

 We are similarly unpersuaded by defendant’s argument that because she was tired toward the end of her testimony, when cross-examination occurred, she was “inattentive.” If that were the criteria of competency, many witnesses would not qualify, since anyone on the stand for several hours will be more tired when they finish than when they began. Furthermore, there is nothing from which we could con-elude that Diane was “less attentive” because of fatigue, as defendant suggests. She answered each question asked of her to the best of her ability, and defendant, in his brief, does not cite one instance from the record to demonstrate this asserted “inattentiveness.”
 

 Defendant also relies on Diane’s inability to communicate verbally in analogizing the instant case to White; however, here, unlike the witness in White, Diane was able to do much more than indicate yes or no; she could demonstrate what happened by using dolls and other aids and by reenactment, and was able to describe what defendant was wearing and to identify him. Thus, she clearly had a greater capacity for communication. Unfortunately, we have not discovered, nor have the parties cited, any Illinois case which considers the effect of a witness’ inability to communicate verbally; however, we have considered cases from other jurisdictions which have addressed this issue.
 

 In Burgess v. State (1951), 256 Ala. 5, 53 So. 2d 568, the only witness to a murder was a deaf and mute woman who knew no sign language. The court found no abuse of discretion in permitting her to testify where the evidence indicated that she was otherwise competent, and rejected the defendant’s argument that he would “be put to great disadvantage in cross-examination to test the witness’ credibility.” (256 Ala. 5, 8, 53 So. 2d 568, 571.) A similar result was reached in Hyman v. State (Ala. App. 1976), 338 So. 2d 448, in which an otherwise competent deaf and mute 10-year-old witness was permitted to testify over the defendant’s objection that he would be placed at a disadvantage in cross-examination. Finally, in State v. Galloway (1981), 304 N.C. 485, 284 S.E.2d 509, the complaining witness in a rape prosecution was deaf and mute. In considering the defendant’s contention that her testimony should have been stricken, the court noted:
 

 “The general rule appears to be that deaf and mute persons are not incompetent as witnesses merely because they are deaf and mute if they are able to communicate the facts by a method which their infirmity leaves available to them and are of sufficient mental capacity to observe the matters as to which they will testify and to appreciate the obligation of an oath.” (304 N.C. 485, 493, 284 S.E.2d 509, 514-15.)
 

 It went on to explain:
 

 “Society has recognized the necessity for a means of communication under such circumstances, and the method employed here [a sign language interpreter] was proper in every respect. Indeed, we know of no other practical method by which a trial could be conducted under these circumstances. *** Any confusion arising from the use of sign language to communicate with a deaf and [mute] witness goes to the weight, and not the admissibility, of the evidence. To hold otherwise would allow this defendant and others to commit crimes against persons born deaf and [mute] with impunity.” (304 N.C. 485, 494, 284 S.E.2d 509, 515.)
 

 We find this reasoning persuasive, and hold that a witness’ inability to speak does not render her incompetent to testify or violate the defendant’s right to cross-examine witnesses so long as she is able to communicate the facts by other methods and otherwise meets the tests of legal competency; i.e., that she can observe, recollect, and appreciate the moral duty to tell the truth. In the instant case, because Diane was able to communicate by other means and was otherwise competent, we reject defendant’s contention that his constitutional right to confront witnesses was violated.
 

 Defendant next asserts that the trial court improperly allowed the State to ask the complaining witness leading questions in establishing the essential elements of the crime. In particular, he objects to the following exchange:
 

 “Q. He put his penis on your vagina?
 

 A. (Witness gestures; no audible response.)
 

 Q. She’s nodding affirmatively.
 

 * * *
 

 Q. Did he have sex with you? Did he enter your vagina?
 

 A. (Witness gestures; no audible response.)
 

 Q. Indicating, the witness pointed affirmatively.”
 

 The allowance of leading questions is within the discretion of the trial court, and its decision will not be reversed unless it abused that discretion and the defendant has been substantially injured as a result. (People v. Williams (1976), 37 Ill. App. 3d 1006, 347 N.E.2d 368.) In the instant case, Diane had already demonstrated what happened, using anatomically correct dolls, prior to responding to the above questions. Furthermore, it is obvious, given her physical disability, that it was frequently necessary to employ questions requiring a yes or no response, and that the above questions were asked in clarification of what she had already sought to demonstrate. We believe that, under these circumstances, there was neither an abuse of discretion nor any injury to defendant. See People v. Luigs (1981), 96 Ill. App. 3d 700, 421 N.E.2d 961 (similar question found proper when asked in clarification).
 

 Finally, defendant contends that he was not proved guilty beyond a reasonable doubt. Specifically,, he argues that various inconsistencies in the testimony render it incredible.
 

 The clear and convincing testimony of a complaining witness is sufficient to sustain a conviction for rape, even though contradicted by the defendant (People v. Szudy (1982), 108 Ill. App. 3d 599, 439 N.E.2d 137), and, while we will carefully examine the evidence (People v. Baseer (1980), 90 Ill. App. 3d 866, 414 N.E.2d 5), it is the function of the trier of fact to determine the credibility of the witnesses and the weight to be given the evidence (People v. Thomas (1981), 96 Ill. App. 3d 443, 421 N.E.2d 357), and we will not encroach on that function but will reverse only where the evidence is so unsatisfactory, unreasonable, or improbable as to create a reasonable doubt of the defendant’s guilt (People v. Edmond (1979), 76 Ill. App. 3d 540, 395 N.E.2d 106).
 

 In the instant case, defendant points to several inconsistencies in the complainant’s testimony, particularly in regard to how she was dressed at the time, and what time defendant arrived, what time he left, and how long he was there. However, it is our view that these inconsistencies were minor, and therefore affected only Diane’s credibility and the weight to be given her testimony. The trier of fact found her credible, despite these inconsistencies, and we will not substitute our judgment thereon. (See People v. Baseer (1980), 90 Ill. App. 3d 866, 414 N.E.2d 5.) Defendant further posits that because Diane indicated that she had never seen him before, her identification of him must have stemmed from her sister’s suggestion that he was the assailant. We fail to see how this is material, since Diane positively identified defendant in court. Moreover, while it appears that Diane became confused when asked whether she had seen defendant on a prior occasion, not only her sister, but defendant himself, stated that they had met prior to the incident. Thus, the record does not support defendant’s contention that Diane’s identification was based on suggestion by Edith. Immediately after the rape, Diane indicated to Edith that her assailant was a friend of Edith’s who had been to her home. It was only then, based on the fact that defendant was the only male friend she had ever taken to her sister’s home, that Edith suggested defendant’s name to her. Therefore, we do not believe that the testimony in question was so impossible or improbable as to raise a reasonable doubt as to defendant’s guilt.
 

 For the foregoing reasons, the judgment is affirmed.
 

 Affirmed.
 

 WILSON, P.J., and LORENZ, J., concur.