Gregory Charles BYNDOM *v.* STATE of Arkansas

CR 00-59                                      39 S.W.3d 781

Supreme Court of Arkansas
Opinion delivered April 5, 2001
[Petition for rehearing denied May 10, 2001.]

*William R. Simpson, Jr.,* Public Defender, by: *Clint Miller,* Deputy Public Defender, for appellant.,

*Mark Pryor,* Att'y Gen., by: *David R. Raupp,* Sr. Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Appellant Gregory Charles Byndom appeals his rape conviction, arguing that the trial court erred in finding the victim, Shaneani Mason, competent to testify at trial. The State cross-appeals, asking this court to hold that the trial court erred in disallowing Mason to use a computerized augmentative communication device while she testified and further arguing that the trial court erred by concluding that Byndom's prior Illinois voluntary manslaughter conviction did not subject him to second-strike status under Arkansas law. We affirm on direct appeal and dismiss on cross-appeal.

*Facts*

Mason is a twenty-five-year-old woman with cerebral palsy and mental retardation caused by suffering strokes as a child due to Sickle Cell disease. Mason lived with Byndom's girlfriend, Rita Bealer, who was paid a stipend by the State to help care for Mason because Mason cannot care for herself, stand or move without assistance, or speak without the assistance of a Dynavox computer, an augmented speaking device.

On the night of July 20, 1998, Bealer and her children left the house to go to the store sometime in the evening after Mason had gone to bed. While they were gone, Byndom entered Mason's room, removed his and her clothes, and had sexual intercourse with Mason while he was wearing a condom. According to Mason, she did not report this incident to Bealer because Mason feared Byndom, but two days later reported the attack to Tracy Ross, a registered nurse who met with Mason approximately once every

two weeks to perform home-health assessments. Ross, who had cared for Mason for approximately two years, testified that Mason became distraught at the end of their visit on July 22, 1998, and Ross finally persuaded Mason to tell her what the problem was. Because Mason is unable to speak, Ross obtained the information from Mason through a series of yes/no questions, interpretation of Mason's body language, and use of the Dynavox computer, which synthesizes speech for its users. Mason indicated that she knew her attacker and identified him that day by typing "Charles" on her Dynavox screen. Later it became clear to Ross that Mason meant the defendant, Charles Byndom. Ross immediately reported the attack to the police, who took Mason's statement using the same questioning technique, and Mason was ultimately removed from Bealer's home. A rape kit was performed immediately at Arkansas Children's Hospital and, according to the physician who conducted the examination, Mason suffered from a three-centimeter traumatic tear in her vaginal area resulting from penetration of some object. The physician testified that due to Mason's own physical disabilities, she could not have inflicted this injury on herself.

On October 16, 1998, and amended on November 3, 1998, the State filed a felony information against Byndom charging him with rape under Ark. Code Ann. § 5-14-103(a)(1) (Repl. 1997) for engaging in sexual intercourse with Mason by forcible compulsion or, in the alternative, by engaging in sexual intercourse with Mason when she was unable to consent because she was physically helpless as defined in Ark. Code Ann. § 5-14-103(a)(3). During pretrial proceedings, the defense filed a motion on February 12, 1999, for a hearing to determine whether Mason was competent to testify at trial. This hearing was held on March 10, 1999, at which Mason testified using her Dynavox computer to help her speak. The computer allows the user to touch icons on the computer screen or type in words on the keyboard, and the computer then "speaks" the phrase or word indicated. Words and phrases can be programmed into the computer's memory, and they are then represented by icons on the screen. The icons can be grouped on different pages to allow the user to gather appropriate phrases or words for different situations.

At the hearing, the State called three witnesses. First, Kim Wallace, a speech pathologist and director of the preschool and therapy programs at United Cerebral Palsy (UCP), testified that she worked with Mason for several years through UCP. Wallace testified

that Mason is a "nonverbal communicator," meaning that she communicates with gestures, eye movement, and body posturing, although her abilities are limited due to the cerebral palsy. Wallace also testified that Mason used the Dynavox computer to synthesize speech, and that it allowed Mason to "speak" through different icons programmed into the computer by Wallace and others. Wallace testified that while someone other than Mason programs in different terms and phrases, use of those terms or phrases is strictly up to Mason who chooses the applicable icon from thousands found on the computer. Wallace testified that Mason's memory and ability to understand are "wonderful," her hearing is normal, and she is aware of her surroundings.

Next, the State called Paula Radar, director of adult rehabilitative services at UCP, who testified that she first met Mason in 1991 through UCP, and she has found Mason capable of communication through gestures and the Dynavox computer. Radar also explained that in anticipation for the trial, she discussed with Mason her upcoming testimony, and Mason directed her to have programmed into the Dynavox computer terms and phrases necessary to aid Mason in testifying. Radar testified that through a series of yes/no questions, Mason indicated the information she wanted in the computer, Radar wrote the information down, and Wallace programmed the information into the computer.

Finally, Mason testified using the Dynavox computer and by responding with gestures. She explained where and with whom she lived, her previous living arrangements with Bealer, and the fact that she understood what it meant to tell the truth. On cross-examination, Byndom's defense attorney attempted to show that Mason was unable to speak herself, and that the Dynavox computer was slow.

Following the hearing, the judge entered an order on March 17, 1999, finding that Mason was competent to testify. In the order, the court also noted that it heard arguments regarding the State's amendment of the felony information to allow a "second-strike" provision for punishment purposes based on Byndom's previous criminal conviction of voluntary manslaughter in Illinois. The trial court ruled that the felony information could not contain the provision, and that it should be stricken.

During pretrial proceedings, the parties continuously debated how Mason would testify using the Dynavox computer because

many terms and phrases had been programmed into the computer in anticipation of questions that might be asked at trial. The court limited the form of the questions to be asked, noting that the State could not ask leading questions, and that the State had to provide to the defense paper copies of the screens and terms that would be used by Mason at trial. On May 12, 1999, Byndom requested that the trial court reconsider its order finding Mason competent. On May 17, 1999, the State filed a motion in limine to direct the trial court to require defense counsel to only ask one question at a time of Mason during cross-examination to allow her time to answer the questions presented. On August 16, 1999, defense counsel filed a motion to exclude hearsay testimony from Mason. The defense argued that the pictures and statements contained on the Dynavox computer were hearsay, irrelevant, and highly prejudicial, and should be excluded.

The trial began on August 24, 1999. Prior to selecting the jury, the parties again debated how Mason would testify using the Dynavox computer. The defense renewed its motion to have Mason declared incompetent to testify, and the court again denied that motion. The defense then argued that the preprogrammed words and phrases on the Dynavox computer were hearsay and should be excluded. During trial, the State presented a number of witnesses who testified regarding Mason's reporting of the rape to them and through them, as well as Mason's physical and mental restrictions. During Wallace's testimony, the parties again debated the admissibility of the words and phrases taken from the Dynavox computer. Wallace testified that while she created the pages and determined where to put each word or phrase and its related icon, Mason's response to questions by choosing a word or icon was her own choice. On cross-examination, defense counsel presented Wallace printed pages of the screens from the computer, and the State objected to the admission of the pages as hearsay. Defense counsel agreed and further asked that all of the information from the computer be determined hearsay. The prosecution attempted to clarify that it meant that the printed pages as interpreted by defense counsel were hearsay, but the court apparently misunderstood the State's objection on hearsay grounds, and ultimately ruled that Mason could not use the Dynavox computer because it was hearsay, and instead could only use the yes/no feature on the computer to answer questions. The defense and prosecution argued that this would limit their ability to question Mason, but the court found that they brought such a ruling upon themselves.

Mason testified after this exchange, and the State proceeded by asking yes/no questions. Mason testified that Byndom raped her, that she attempted to push him away but could not, and that she did not consent to have sexual intercourse with him. On cross-examination, defense counsel questioned Mason on why she waited to report the attack, to whom she reported it, and who attacked her. Through yes/no responses, Mason was able to identify the various people who helped her as well as indicate that Byndom was the person who attacked her. Again, during cross-examination, defense counsel argued that by only being able to ask yes/no questions, Byndom's constitutional right to confrontation was being violated, and he again asked that Mason be declared incompetent to testify. The court denied the motion again. The State also objected again to the court's ruling denying Mason the ability to use the computer, and argued that it was the paper copies of the computer screens to which the State objected, not the actual use of the computer. The trial court again denied the State's request to use the computer. However, the trial court actually allowed Mason to return to using the Dynavox computer during cross-examination as long as the icons did not appear on the projection screen set up behind her for the jury to see. At the close of Mason's testimony, the defense again asked that Mason be declared incompetent. The trial court again denied the motion.

At the close of trial, the jury found Byndom guilty of rape, and he was sentenced to twenty years in prison. The judgment and commitment order was entered on September 9, 1999, and the defense filed a motion for new trial on September 28, 1999. A hearing was held on this motion on October 4, 1999, and the trial court denied the motion in an order dated October 11, 1999. Byndom filed his notice of appeal on October 20, 1999, and the State cross-appealed on November 17, 1999.

## I. Byndom's Direct Appeal

Byndom raises one point on appeal. He argues that the trial court erred in finding Mason competent to testify at trial because she lacked the testimonial capacity of narration, and defense counsel was unable to effectively cross-examine her. The State counters by noting that the defense obtained a favorable ruling on the exclusion of the Dynavox computer to aid Mason's testimony, so the defense now cannot claim error because it invited the error itself. Alternatively, the State argues that Byndom's argument fails on the merits

because Mason possessed narrative capacity as conceded by the defense and as evidenced by Mason's ability to communicate through yes/no responses and other physical sounds, gestures, eye movement, and body movement.

The question of the competency of a witness is a matter lying within the sound discretion of the trial court and in the absence of clear abuse, we will not reverse on appeal. *King v. State*, 317 Ark. 293, 877 S.W.2d 583 (1994); *Jackson v. State*, 290 Ark. 375, 720 S.W.2d 282 (1986). The trial court must begin with the presumption that every person is competent to be a witness. *Id.*; Ark. R. Evid. 601. The party alleging a witness is incompetent has the burden of persuasion. *Logan v. State*, 299 Ark. 266, 773 S.W.2d 413 (1989). The issue of competency of a witness is one in which the trial judge's evaluation is particularly important due to the opportunity he is afforded to observe the witness and the testimony. *Clifton v. State*, 289 Ark. 63, 709 S.W.2d 63 (1986). As long as the record is one upon which the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts, we will not hold there has been a manifest error or abuse of discretion in allowing the testimony. *Hoggard v. State*, 277 Ark. 117, 640 S.W.2d 102 (1982); *Chambers v. State*, 275 Ark. 177, 628 S.W.2d 306 (1982).

Competency, as referred to in Ark. R. Evid. 601, is not to be confused with reliability. *Hammon v. State*, 338 Ark. 733, 2 S.W.3d 50 (1999). Testimony by competent witnesses may be presented to the finder of fact. The jury then evaluates the evidence, considers the credibility of the witness, and arrives at its conclusion. The criteria for determining whether a witness is competent to testify are: (1) the ability to understand the obligation of an oath; (2) an understanding of consequences of false swearing; (3) the ability to receive and retain accurate impressions; and (4) the extent that the capacity exists to transmit to the fact-finder a reasonable statement of what was seen, felt or heard. *Logan, supra; Chambers, supra.* The issue of competency of a witness is one in which the trial judge's evaluation is particularly important due to the opportunity he or she is afforded to observe the witness and the testimony. *King v. State*, 317 Ark. 293, 877 S.W.2d 583 (1994).

The parties do not cite, and this court has not found, any Arkansas cases wherein a witness cannot speak due to a physical disability, but can communicate through other means besides a

court interpreter. However, several other jurisdictions have considered similar issues. Illinois appellate courts have faced such a situation in at least two criminal cases. In *People v. Spencer*, 457 N.E.2d 473 (Ill. App. 1983), the Illinois Court of Appeals considered a case in which a thirty-one-year-old deaf-mute woman was raped. The mildly to moderately retarded woman could not speak, but instead communicated through gestures and references to picture symbols, numbers, colors, and the alphabet. The defense objected at trial to these methods of communication, arguing that they denied the defendant the right to confrontation because she could not verbally communicate. The trial court denied this objection, and the appellate court affirmed, stating:

> [A] witness's inability to speak does not render her incompetent to testify or violate the defendant's right to cross-examine witnesses so long as she is able to communicate the facts by other methods and otherwise meets the tests of legal competency; i.e., that she can observe, recollect, and appreciate the moral duty to tell the truth. In the instant case, because Diane was able to communicate by other means and was otherwise competent, we reject defendant's contention that his constitutional right to confront witnesses was violated.

*Spencer*, 457 N.E.2d at 485. The court also held that a witness suffering from mental impairment such as retardation is legally competent to testify so long as she has the capacity to observe, recollect and communicate, and that the defendant cannot rely merely on the fact that the witness is retarded to challenge her competency. *Id.*, 457 N.E.2d at 483. Finally, the appellate court cited similar cases from other jurisdictions in which witnesses who could not speak and knew no form of sign language were found competent to testify. *See Burgess v. State*, 53 So.2d 568 (Ala. 1951); *Hyman v. State*, 338 So.2d 448 (Ala. App. 1976); and *State v. Galloway*, 284 S.E.2d 509 (N.C. 1981). The court in *Galloway* stated:

> The general rule appears to be that deaf and mute persons are not incompetent as witnesses merely because they are deaf and mute if they are able to communicate the facts by a method which their infirmity leaves available to them and are of sufficient mental capacity to observe the matters as to which they will testify and to appreciate the obligation of an oath. 97 C.J.S. *Witnesses* §§ 61 (1957).

\* \* \*

Society has recognized the necessity for a means of communication under such circumstances, and the method employed here was proper in every respect. Indeed, we know of no other practical method by which a trial could be conducted under these circumstances. This Court, like the trial court, is unable to bestow upon the prosecuting witness the ability to hear and to speak. The jury was made aware of the problems of interpreting. Any confusion arising from the use of sign language to communicate with a deaf and dumb witness goes to the weight, and not the admissibility, of the evidence. To hold otherwise would allow this defendant and others to commit crimes against persons born deaf and dumb with impunity.

*Galloway,* 284 S.E.2d at 514-515. In *Burgess,* the Alabama Supreme Court allowed a deaf-mute woman to testify about her father's murder using her brother as her interpreter. The woman did not know sign language, but instead communicated through yes/no signaled responses and gestures that her brother understood and interpreted for the court. In permitting this form of testimony, the court stated:

It is well settled by modern authority that it is permissible for such a witness to testify as against the objection that the party against whom such testimony is given will be put to great disadvantage in cross-examination to test the witness's credibility. [Citations omitted.] And it is observed by Professor Chamberlayne ... that: "And though a [deaf mute] person may not be educated in the use of signs and can only express assent or dissent by a nod or shake of the head, thus rendering cross-examination difficult, he may nevertheless be permitted to testify, but it is said that his disability may be considered by the jury, as bearing upon the weight of his testimony. That difficulty attends the examination of a deaf-mute is no reason why his testimony should be excluded...." [Citations omitted.]

*Burgess,* 53 So.2d at 571.

Illinois again faced a competency challenge in *People v. Vandiver,* 468 N.E.2d 454 (Ill. App. 1984), wherein the court affirmed the trial court's ruling that the defendant's Sixth Amendment right to confront his accuser was not violated where the deaf and mute witness testified through the use of two sign language

interpreters. The defense objected, arguing that the witness's testimony was twice removed, thus opening it up to greater interpretation and error. The appellate court, however, determined that "testimony of a deaf witness may be secured by whatever means are necessary and best adapted to the case...." *Vandiver*, 468 N.E.2d at 458.

These persuasive authorities indicate that Mason's inability to speak did not render her incompetent. Rather, the focus in such a case is on the witness's ability to communicate thoughts, impressions, feelings, and beliefs, and here Mason was able to do all of that by virtue of her gestures, facial expressions, ability to sign "yes" and "no," and by the limited use of the yes/no function key on her Dynavox computer. To hold otherwise would render a segment of society incompetent merely because they cannot communicate as effectively and in the same manner as those who can speak through oral, written, or signed language. Furthermore, as the State notes in its response brief and as indicated in the record, the trial court actually allowed Mason to return to using the Dynavox computer during cross-examination as long as the icons did not appear on the projection screen set up behind her for the jury to see. This ruling properly recognized that the Dynavox computer did not constitute hearsay evidence where the user, Mason, could directly answer a question with an answer only she could choose from thousands of words and phrases programmed into the computer. As such, the defendant's assertion that Mason could not communicate effectively suffers a devastating blow when it is apparent that the defense had the opportunity to elicit more detailed responses from Mason through the Dynavox computer. However, the defense continued to mostly ask yes/no questions of Mason even after the trial court allowed Mason to utilize her computer to render more thorough responses.

Finally, any difficulty Byndom had in cross-examining Mason was of his own making. The record at trial indicates that the defense objected at every turn to Mason's use of the Dynavox computer, arguing that the computer's screens and programmed icons and responses constituted hearsay because they were prepared by another person. The trial court granted Byndom's request to limit Mason's use of the Dynavox computer, and Byndom cannot now complain of error he invited. *Harris v. State*, 295 Ark. 456, 748 S.W.2d 666 (1988). Because Byndom received a favorable ruling to his motions to prevent the use of the Dynavox computer based on hearsay, he cannot now complain of his inability to effectively

question Mason without it. *Byrd v. State*, 337 Ark. 413, 992 S.W.2d 759 (1999). Therefore, because Byndom's objections to the use of the Dynavox computer caused its exclusion at trial, and because even without the use of the computer Mason was still competent to testify, we affirm the conviction.

## II. State's Cross-Appeal

The State cross-appealed in this case, arguing two separate points on appeal. First, the State argues that this court should declare error in the trial court's restriction of Mason's use of her Dynavox computer to testify at trial. The State argues that the computer was not hearsay, but merely a different form of communication allowing Mason to testify on her own through preprogrammed words and phrases. Second, the State argues that the trial court erred by concluding that Byndom's prior Illinois voluntary manslaughter conviction did not subject him to "second-strike" status under Ark. Code Ann. § 5-4-501(c)(1) and (2)(B). The State argues that Illinois's voluntary manslaughter statute is comparable to Arkansas's second-degree murder statute, and that this similarity would allow the voluntary manslaughter conviction to be used in Arkansas for heightened punishment.

Byndom responds by arguing that the State's cross-appeal was untimely under Rule 3 of the Arkansas Rules of Appellate Procedure—Criminal or any other rule allowing appeals in criminal or civil cases. As such, this court should not entertain the cross-appeal. On the merits, Byndom first argues that the first issue raised by the State is not one that bears on the correct and uniform administration of the criminal law, and that this court would be issuing an advisory opinion because the State cannot show prejudice since it prevailed below. Second, Byndom argues that as applied to this case, when Byndom was convicted in Illinois, voluntary manslaughter was defined as the unintentional killing of a person in a reckless manner. This is more like Arkansas's crime of manslaughter than second-degree murder.

This court cannot reach the issues in the State's cross-appeal because it was not timely filed. The State's right to file a criminal appeal arises under Ark. R. App. P.—Crim. 3, which states in pertinent part:

     (b) Where an appeal, other than an interlocutory appeal, is desired on behalf of the state following either a misdemeanor or felony prosecution, the prosecuting attorney shall file a notice of appeal within thirty (30) days after entry of a final order by the trial judge.

This rule does not state "Where a *direct* appeal..." but instead states "Where an appeal...." Although the State attempts to argue that Rule 3 does not apply to cross-appeals, there is no other authority under which the State could cross-appeal in a criminal case.[1] This court, in a concurring opinion in *Osborne v. State*, 340 Ark. 444, 11 S.W.3d 528 (2000), said:

> "[W]hile our Rules of Appellate Procedure—Criminal do not specifically mention cross-appeal, as such, our Rules of Appellate Procedure—Civil clearly do (see Ark. R. App. P.—Civ. 3(d)), and these civil appellate rules have commonly been referred to and applied when necessary in criminal appeals."

The time line in this case indicates that after Byndom was convicted, the judgment and commitment order was entered on September 9, 1999. The defense filed a motion for new trial on September 28, 1999. A hearing was held on this motion on October 4, 1999, and the trial court denied the motion in an order dated October 11, 1999. Byndom filed his notice of appeal on October 20, 1999, and the State filed its notice of cross-appeal on November 17, 1999.

    As noted in Rule 3(b), the State must file its appeal within thirty days after the entry of a final order by the trial judge. Here, the State did not file its notice of cross-appeal thirty days after the entry of the judgment and commitment order on September 9, 1999. Even if this court considers the trial court's denial of the motion for new trial on October 11, 1999, as the trial court's final order, the State did not file the notice of cross-appeal within thirty days of the entry of that order as required by either Rule 3(b) for appeals by the State or by Ark. R. App. P.—Crim. 2(a)(2), which applies to appeals by all other parties besides the State in criminal cases.

---

[1] The issue of whether the State can file a cross-appeal pursuant to the Arkansas Rules of Appellant Procedure - Civil is not before the court, and the court is not ruling on that issue.

■ ■ As a final note, the State argues on this issue that the Arkansas Rules of Appellate Procedure—Criminal do not provide for a time limit for the State to file a cross-appeal, so there can be no timeliness violation. The State is correct that the rules do not specifically set out a time for the State to file a cross-appeal. However, this court has referred to and applied the Rules of Appellate Procedure—Civil when necessary in criminal appeals. Under Ark. R. App. P.—Civ. 4(a), a party cross-appealing must file within ten days after receipt of the other party's direct appeal. However, even under that rule, the State still did not comply because it filed its cross-appeal twenty-seven days after Byndom filed his appeal, and made no showing that it did not receive Byndom's notice of appeal within ten days of filing its cross-appeal. Therefore, the State's cross-appeal was untimely, and this court will not consider it.

We affirm on direct appeal and dismiss the cross appeal.