Ricky Dean MODLIN *v.* STATE of Arkansas

CR 02-784                                              110 S.W.3d 727

Supreme Court of Arkansas
Opinion delivered May 1, 2003

*William R. Simpson, Jr.*, Public Defender, by: *Clint Miller*, Deputy Public Defender, for appellant.

*Mike Bebee*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Ricky Dean Modlin appeals his conviction for first degree murder and sentence of life in prison. Modlin raises one issue on appeal. He alleges that the trial court committed reversible error in finding that his seven-year-old son Carey Modlin was competent to testify. We hold that the trial court did not abuse its discretion in finding Carey competent to testify. Modlin's conviction and sentence are affirmed.

*Facts*

Modlin was charged with the capital murder of his wife Rene. Modlin did not deny that he bludgeoned his wife to death with a

pipe wrench. The jury was asked to determine whether Modlin was guilty of capital murder or a lesser included offense of capital murder. The jury convicted Modlin of first degree murder.

According to Dr. Stephen Erickson, a forensic pathologist with the Arkansas State Crime Lab, Rene died from injuries suffered by being struck at least nine times in the head. The only witnesses to the murder were Modlin and Rene's sons Carey and Jonathon Modlin. At the time of the murder, Carey was five and Jonathon was four. Jonathon was not called to testify, but Carey was called to the stand.

Modlin made statements to police at two different times in this case. He first spoke with police when the officers arrived at his home at the Ramada Inn to investigate a report of a possible death in the Modlin home. After being read his Miranda rights, Modlin told police that Rene was dead, and that he had killed her. Modlin subsequently submitted to an interview and gave a statement after his arrest. In that interview, Modlin told police that he and Rene had been fighting for a month and a half over her use of the Internet. Modlin complained to police in his interview that Rene was on the Internet twenty-four hours a day, and that she began receiving a large number of e-mails, including e-mails from men. Modlin further told police that on July 22, 2000, he asked his wife to get off the Internet, and a fight ensued. Modlin recounted that during the fight, Rene tried to hit him with a phone, and then assaulted him, causing the two of them to fall to the floor. Finally, Modlin told police that once on the floor, he grabbed a nearby pipe wrench and struck Rene in the head a couple of times.

The evidence in this case showed that after Modlin killed Rene, he put her body in a spare bathroom and covered her body with a comforter. He then sealed the door with duct tape and placed a refrigerator in front of the door. Modlin then filed a missing persons report with police. Lynn Holland, Modlin's cousin, testified that on July 23, 2000, he received a telephone call from Modlin and then drove to the Modlin home with his nephew. According to Holland's testimony, once he arrived, he and Modlin took Holland's nephew and Modlin's two sons to a

park so Holland and Modlin could talk while the boys played. Holland then testified that at the park, Modlin asked him "what if he killed her and stuff like that." Holland further testified that Modlin explained that he thought Rene was seeing somebody, that he was afraid that Rene would leave him, and that he was afraid he would lose the kids.

Holland testified that upon their return to the Modlin home, Modlin brought out a bag and put it in Holland's car. Holland described the bag as a "clearish-white" trash bag that appeared to contain linens. Holland testified that they went for a drive, and that Modlin asked Holland to stop so Modlin could throw the trash bag in the dumpster at a Napa store. Holland further testified that upon their return to the Modlin home, Modlin got some bleach and began rubbing the carpet with the bleach. Holland then left, but he testified that he returned to the Modlin home two days later on the night of July 25 and into the early morning of July 26 because Modlin's mother was afraid Modlin might hurt himself.

Holland testified that on this visit, five-year-old Carey kept asking for his momma, and pointing toward the refrigerator that was standing in front of a door. Holland then testified that he opened the refrigerator, but Carey still kept saying "Momma." Holland further testified that he moved the refrigerator to open the door, but had to force it open. Once he opened the door, Holland saw blankets and what he thought was a body. He reached down and felt of the comforter, confirming that there was a body beneath the comforter. He confronted Modlin, accusing him of killing Rene, and left. Holland then told family members what he had found and they went to the police.

Responding to the report from Holland's family, police went to the Modlin home. Upon arrival, Lieutenant Sherry Jordan identified Modlin. According to Jordan's testimony, she asked Modlin if Rene was his wife, and Modlin responded "yes." Jordan testified that she then read Modlin his Miranda rights and asked him if his wife was home. Modlin told her "yes." According to Jordan's further testimony, she then asked Modlin if Rene was dead, and when he said "yes," Jordan asked him if he had killed her. Jordan testified that Modlin told her that he had killed Rene. Jordan then asked for

consent to search Modlin's home, which Modlin granted. Police entered his home, and they found Rene's body.

The State waived the death penalty, and the focus of the State at trial was to prove premeditation and deliberation to obtain a conviction on capital murder. The State intended to put Carey on the stand to testify. Modlin challenged his son's competency, and a competency hearing was held in which Carey was examined with regard to his ability to testify. Modlin alleges that the trial court erred in finding Carey competent to testify.

*Competency*

In Arkansas, every person is presumed to be competent to be a witness. *Clem v. State*, 351 Ark. 112, 90 S.W.3d 428 (2002); Ark. R. Evid. 601 (2001). Therefore, the party who challenges the competency of a witness bears the burden of showing that the potential witness is incompetent. *Byndom v. State*, 344 Ark. 391, 39 S.W.3d 781 (2001); *Logan v. State*, 299 Ark. 266, 773 S.W.2d 413 (1989).

Child witnesses are treated no differently than adults in determining competency. The age of a child is not determinative of competency. *See Hoggard v. State*, 277 Ark. 117, 640 S.W.2d 102 (1982). We apply the same presumption and standards in deciding the capacity of a child witness to testify as are applied in determining the competency of any witness. *Holloway v. State*, 312 Ark. 306, 849 S.W.2d 473 (1993).

A decision about the competency of a witness lies within the sound discretion of the trial court. *Clem, supra.* This is so because the issue of competency of a witness is one in which the trial judge's evaluation is particularly important due to the opportunity he or she is afforded to observe the witness and the testimony. *Byndom, supra; Clifton v. State*, 289 Ark. 63, 709 S.W.2d 63 (1986). This court will not find an abuse of discretion in allowing a witness to testify as long as the record in the case is one upon which the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts. *Id.; Hoggard, supra.*

█ In *Clem, supra,* this court set out the criteria for competency as:

> (1) the ability to understand the obligation of an oath and to comprehend the obligation imposed by it; or (2) an understanding of the consequences of false swearing; or (3) the ability to receive accurate impressions and to retain them, to the extent that the capacity exists to transmit to the factfinder a reasonable statement of what was seen, felt, or heard.

*Clem,* 351 Ark. at 124.

In *Clifton, supra,* this court stated:

> As long as the record is one upon which the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember, and relate facts, we will not hold that there has been a manifest abuse of discretion in allowing the testimony.

*Clifton,* 289 Ark. at 65.

In the competency hearing on direct examination by the State, Carey responded "yes" when asked if he knew the difference between a lie and the truth. When asked what happens if one tells a lie, Carey stated "You're in trouble." Carey then promised he would tell the truth. When asked if he remembered what happened at the Ramada Inn, Carey responded, "No, sir." Carey was then asked if he remembered telling the prosecutor about what happened and Carey nodded his head up and down. When asked to tell the judge what happened, Carey recounted:

> We were sitting down on the couch and then we heard momma scream because Daddy was hitting her and Daddy—kept on telling Daddy to stop and he wouldn't and when she fell down he stopped. And then he told us to sit down because he would get us something to eat. Then he put Momma in the bed and gave her something to eat and he said that she was using the bathroom, but she wasn't. And then whenever we would go in there he told us to sit down. Then he put Momma under the bed. And then when we was asleep he took Momma and put her behind—in the old bathroom that wouldn't work and he put—and he took duct tape and put it on there and put—and put the refrigerator right there so no one could get to them.

Carey also testified that his father hit his mother with a monkey wrench, and that his father wrapped the wrench in a trash bag and took it to the trash because his father could not get the blood off the wrench. Carey further testified that his father told him and his brother not to tell anyone what had happened.

On cross examination, Carey was asked, "Do you know what it meant when you put up your hand up, when he asked you to raise your hand and then he asked you something?" Carey shrugged his shoulders in reply, and then said, "I cannot tell you in my own words what it means. I don't know what it means." When Carey was asked if he remembered the question he was asked when he had his hand raised, Carey responded "I don't know." Carey was then asked on cross-examination, "And do you remember what would happen if you don't tell the truth here today," and Carey responded, "Huh-uh." Carey then stated, "I know the difference between right and wrong. If you tell something—when you say something that's wrong—when you say something that's wrong, you'll get in trouble." However, when asked what kind of trouble, Carey shook his head side to side.

■ Modlin argues that Carey was not competent because he did not understand the obligation of taking an oath, and because he did not understand the consequences of lying after swearing to tell the truth. Modlin argued to the trial court that Carey was unsure about what an oath was, and did not know why he was holding up his hand. Modlin's counsel argued, ". . . it would seem that the witness would not be competent because he just does not know what the oath means by his own admission multiple times." It was not necessary that Carey understand the nature of an oath, the legal concept of false swearing, or why he was holding up his hand. *Clem, supra; Clifton, supra.* Carey's testimony shows a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts. Moreover, the question of competency is a matter of discretion with the trial court. The trial judge presided over the hearing on competency, and had the opportunity to observe Carey and his testimony. The trial court determined that Carey was competent. The trial judge's evaluation is particularly important due to the judge's

opportunity to observe the witness and the testimony. *Byndom, supra.* We find no abuse of discretion in allowing Carey to testify.

*Rule 4-3(h)*

Pursuant to Ark. Sup. Ct. R. 4-3(h)· (2002), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Modlin. No error has been found.

Affirmed.