Clifton Robert WARNER *v.* STATE of Arkansas

CA CR 05-452                                                218 S.W.3d 330

Court of Appeals of Arkansas
Opinion delivered November 30, 2005

*Robert Scott Parks*, Deputy Public Defender, for appellant.

*Mike Beebe*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

Wendell L. Griffen, Judge. Clifton Robert Warner appeals from his conviction for rape. He argues that the trial court erred in allowing testimony regarding a hearsay statement that the victim made and erred in determining that the victim, who was seven years old at the time of the trial, was competent to testify. We disagree and affirm.

Appellant is not related to the victim but was living with the victim's family at the time the alleged abuse occurred. The victim, K.P., who was then five years old, alleged that appellant touched her on the inside of her "pee pee" with his finger. K.P. initially confided in her uncle, Billy Powell, while visiting Powell and his family in Oklahoma. She later disclosed the events to the Children's Advocacy Center in Little Rock, Arkansas.

Based on K.P.'s allegations, appellant was charged with rape as a habitual offender. During pre-trial proceedings, appellant made an oral motion in limine to exclude the hearsay testimony of

K.P.'s second cousin, Debbie Pulliam, regarding an incriminating statement made by K.P. after the alleged event. The trial court held a hearing and denied appellant's motion on the ground that K.P.'s statement qualified as an excited-utterance exception to hearsay pursuant to Ark. R. Evid. 803(2). At the subsequent jury trial, Pulliam testified that when K.P. saw her sister getting into a truck in which the defendant was a passenger, K.P. shouted, "Robert, don't you hurt my sister like you hurt me."

The issue of K.P.'s competency arose during the trial. When the State attempted to call her as a witness, she initially indicated in the jury's presence that she did not know the difference between the truth and a lie. The court then conducted a *sua sponte* hearing outside of the jury's presence. After subsequent questioning of K.P., the court was ultimately convinced that she was competent. K.P. thereafter testified that appellant touched her on the inside of her "pee pee" with his finger and that it made her feel "scared" and "all shaky." She also identified appellant in court as the offender. The jury found appellant guilty and sentenced him to serve twenty years in the Arkansas Department of Correction. This appealed followed.

## I. Witness Competency

■■■ Although appellant challenges the trial court's determination that K.P. was competent to testify in his second point on appeal, we address this issue first before considering any evidentiary errors. The question of the competency of a witness is a matter lying within the sound discretion of the trial court and in the absence of clear abuse, we will not reverse on appeal. *Clem v. State*, 351 Ark. 112, 90 S.W.3d 428 (2002). Any witness is presumed to be competent unless proven otherwise. *Id.*; Ark. R. Evid. 601. The party alleging that a witness is incompetent has the burden of persuasion. *Clem, supra*. The issue of the competency of a witness is one in which the trial judge's evaluation is particularly important due to the opportunity he is afforded to observe the witness and the testimony. *Clem, supra*.

■■■ A witness's competency may be established by the following criteria: (1) the ability to understand the obligation of an oath and to comprehend the obligation imposed by it; or (2) an understanding of the consequences of false swearing; or (3) the ability to receive accurate impressions and to retain them, to the extent that the capacity exists to transmit to the fact finder a

reasonable statement of what was seen, felt, or heard. *Clem, supra.* As long as the record is one upon which the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember, and relate facts, we will not hold there has been a manifest error or abuse of discretion in allowing the testimony. *Clem, supra.*

Further, in a case involving the rape of a child, the trial court is in the best position to determine the child's intelligence and understanding of the need to tell the truth. *Conley v. State,* 20 Ark. App. 56, 723 S.W.2d 841 (1987). In determining the competency of a child witness, the trial court will examine the child's testimony in its entirety and will not solely rely on the preliminary questioning. *Id.*

The competency hearing proceeded as follows:

COURT: Would you tell me what your name is?

A: [K.P.]

COURT: And what is your last name?

A: [K.P.]

COURT: And how old are you [K.P.]?

A: Seven.

COURT: Eleven?

A: Seven.

COURT: Seven, okay and [K.P.] do you know what the truth is?

A: Yes.

COURT: Do you know what a lie is?

A: Um hum —

COURT: You don't, you don't know the difference? What do you think the truth is?

A: The truth is —

COURT: I'm sorry?

A: — what Robert did. The truth is what Robert did.

COURT: Well, what's a lie?

A: I don't know the lie.

COURT: I'm sorry?

A: I don't know the lie.

COURT: You don't know what, you don't lie or you don't —

A: I don't know it.

COURT: You don't know it, you didn't do it.

A: I don't know the lie.

. . .

Prosecution Examination:

Q: Hey [K.P.], when we talked about this today do you know the difference between the truth and a lie?

A: No.

Q: Are you going to tell the truth today?

A: Yes.

Q: Okay, are you — you know, we talked about raising your right hand and having to tell the truth?

A: Yes.

Q: Okay.

Q: Are you satisfied, Judge?

COURT: No.

Q: Hey, [K.P.], do you know what a lie is, do you know that a lie is not telling the truth?

A: Yes.

Q: And do you know that the truth means to tell what really happened?

A: Yes.

Q: And that you just have to answer us truthfully?

A: Yes.

[Bench conference held outside of the hearing of the jury.]

COURT: Counsel, approach. She doesn't know.

PROSECUTOR: Judge, she does.

COURT: Well, she's not saying she does.

PROSECUTOR: She knows, we talked to her about telling the truth and you know, that she can't lie on the witness stand. She says that we're asking her if she's going to lie.

COURT: Well, she doesn't understand, I . . .

. . .

Prosecution Examination:

Q: Hey, [K.P.], that nice man up there you were just talking to?

A: Um hum.

Q: Do you see he has a robe on, what color is that robe?

A: Black.

Q: It's black, if I told you that the robe that the Judge has on was green, would that be the truth or a lie?

A: I don't know.

Q: Would I be telling the truth if I said that robe was black?

A: You'd be telling the truth.

. . .

Q: Hey, [K.P.], do you have any pets?

A: Yeah.

Q: You do, what kind of pets do you have?

A: I've got one that's a Pomeranian.

. . .

Q: Is a Pomeranian a dog or a cat?

A: It's a dog.

Q: If you told me that your Pomeranian was a cat would that be the truth or would that be a lie?

A: A lie.

Q: And if you told me your Pomeranian was a dog, would that be the truth or would that be a lie?

A: The truth.

. . .

Q: If you told me [K.P.] that the Judge's robe was black, would that be the truth or a lie?

A: Truth.

Q: If you told me [K.P.] that the Judge's robe was green, would that be the truth or a lie?

A: A lie.

Q: What about my suit, [K.P.], what color is this?

A: Black.

Q: If you told me that this suit was yellow, would that be the truth or a lie?

A: A lie.

Q: Okay, and if you told me it was black, would that be the truth or a lie?

A: Truth.

Q: Okay.

. . .

Defense Examination:

Q: And we talk about the truth and lies sometimes too, okay, if I told you that it was the truth that the Judge's robe was green, would that be the truth?

A: No.

Q: Okay, sometimes Jackson [his son] and I play a game, I'll tell you something, I hate to tell on Jackson, one time Jackson said that his Daddy was a dummy, now, what did Jackson say?

A: He said his daddy was a dummy.

Q: Okay.

COURT: I didn't hear it.

Q: What did you say.

COURT: What did you say?

A: He said his name was a dummy.

Q: Do you know that's the truth?

A: No.

Q: But I told you it was the truth didn't I?

A: Yes.

Q: Just because I say it, does that make it the truth?

A: No.

Q: Okay.

. . .

DEFENSE: Judge, if I might. Your honor, I noted the Court's consternation. [K.P.]'s initial responses to the questions were that she did not know the difference between a truth and a lie and she stuck to that assertion several times. Now, in all fairness, she was able to name her colors and differentiate between your robe being black and green and Shane's coat being blue and black or whatever, but I'm not firmly convinced that she truly appreciates the difference between the truth and telling a lie. I think she figured out what we wanted her to say. And I think she sort of got the game of the questions, that this is different so I said a lie, this is the same so I say the truth, but I don't — I didn't detect that synthesis level knowledge of falsehood versus truth and I'm not prepared to stipulate to her competency at this time. I'd ask the Court to make a ruling.

. . .

COURT: [K.P.] is competent to testify. She was able to grasp several important points, one of them being just because someone said something was true it's not, doesn't make is true. Did a good job there, [prosecutor].

PROSECUTOR: Thanks.

COURT: And also she was able to distinguish between fact and fiction and I find her to be competent. . . .

Appellant asserts that K.P. was incompetent to testify because she stated several times that she did not know what a lie is and because there was no evidence indicating that she understood the consequences of false swearing or that she had a moral awareness of the obligation to tell the truth. His argument does not persuade.

K.P. originally testified that the truth is what appellant did, and that she did not "know the lie." She also stated that she did not know the difference between the truth and a lie. However, upon further questioning, she indicated that she understood that "the truth" means to tell what really happened and that she knew that a lie is not telling the truth.

In addition, her subsequent responses indicated that she knew the difference between the truth and a lie, as shown in the questions concerning the color of the judge's robe, the attorneys' suits, and her pet Pomeranian dog. While appellant's attorney argued below that K.P. had merely figured out "the game of the questions" that "same" equals "truth" and "different" equals "lie" and that K.P. had merely demonstrated knowledge of different colors, her responses went far beyond that. Rather, her responses established that she knew the difference between the truth and a lie, or as the trial court stated, between fact and fiction.

While appellant also asserts that there was no evidence to indicate that K.P. understood the consequences of false swearing, that is of no moment, because a witness's competency can be established by an understanding of the consequences of false swearing, *or* by the ability to understand the obligation of an oath and to comprehend the obligation imposed by it, in other words, by an awareness of the moral obligation to tell the truth, *or* the ability to receive, retain, and transmit accurate impressions. *Modlin v. State*, 353 Ark. 94, 110 S.W.3d 727 (2003); *Clem, supra.* The *Modlin* court specifically stated that it was not necessary for the witness in that case to understand the nature of an oath, the legal concept of false swearing, or why he was holding up his hand because his testimony demonstrated a moral awareness of the obligation to tell the truth and an ability to observe, remember, and relate facts.

Similarly, here, K.P. demonstrated awareness of her moral obligation to tell the truth and her ability to receive, retain, and transmit accurate impressions. She stated that she was going to tell the truth and she remembered the discussion about swearing an

oath to tell the truth, which the prosecutor referred to as "raising your right hand and having to tell the truth." She further indicated that she knew a lie is not telling the truth, that the truth means to tell what really happened, and that she was required to answer truthfully.

In addition, as indicated by her answers to the questions posed to her by defense counsel's questions concerning his son calling him a "dummy," K.P. demonstrated her ability to receive, retain, and transmit accurate impressions and demonstrated that she understood that simply because a statement is made does not mean the statement is true. Certainly, her questions regarding her pet dog and regarding the "dummy" statement indicated more than a mere comprehension that "same equals true" and "different equals lie."

█ In sum, when all of K.P.'s testimony is considered in its entirety, it is apparent that the record is one upon which the trial judge could find that she possessed moral awareness of the obligation to tell the truth and an ability to observe, remember, and relate facts. *Modlin, supra; Clem, supra.* As such, we hold that the trial court did not abuse its discretion in allowing K.P. to testify.

## II. Excited Utterance

Appellant further argues that the trial court erred in admitting Pulliam's testimony pursuant to the excited-utterance exception to hearsay. This rule, found at Ark. Rule Evid. 803(2) allows the admission of a statement that relates to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition. The testimony at issue is Pulliam's testimony that on August 2, 2002, several weeks after the abuse was disclosed, K.P. shouted at appellant, "Robert, don't you hurt my sister the way you hurt me" when her sister got into the vehicle in which appellant was a passenger.

█ █ For the excited-utterance exception to apply, there must be an event which excites the declarant and the resultant statement must be uttered during the period of excitement and must express the declarant's reaction to the event. *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994). The factors to consider in determining whether a statement is an excited utterance include: (1) the age of the declarant, (2) the physical and mental condition of the declarant, (3) the characteristics of the event, (4) the subject matter of the statement. *Id. (citing United*

*States v. Iron Shell,* 633 F.2d 77 (8th Cir. 1980)). The lapse of time between the startling event and the out-of-court statement, although relevant, is not dispositive whether a statement is an excited utterance. *Id.* In order for this exception to apply, it must appear that the statement was spontaneous, excited or impulsive, rather than the product of reflection and deliberation. *Peterson v. State,* 349 Ark. 195, 76 S.W.3d 845 (2002). It is within the trial court's discretion to determine whether a statement was made under the stress of excitement or after the declarant has calmed down and had an opportunity to reflect. *Moore, supra.*

Appellant challenges the admission of Pulliam's testimony on the grounds that: 1) K.P.'s statement was not made under the stress of the "startling event," because too much time had elapsed between the rape and K.P.'s statement, and 2) Pulliam's testimony was so inconsistent that it was an abuse of discretion to admit it. We hold that the trial court did not abuse its discretion in admitting Pulliam's testimony.

It is not precisely clear when the abuse occurred in this case. K.P. testified that she was five years old when the abuse occurred. She first reported the abuse during the early part of July 2002. According to Billy Powell, K.P.'s uncle, she came·to visit his family near the July 4 holiday. He testified that she reported the incident to him during the second day of her visit.[1]

The testimony is also unclear regarding when K.P. returned to Arkansas. Billy testified that K.P. stayed approximately two weeks. Vonda Powell, K.P.'s mother, testified that K.P. had been back approximately one week before K.P. saw appellant on August 2 incident. Pulliam, by contrast, testified that K.P. returned to Arkansas on August 1, 2002.

In any event, Pulliam testified that on August 2, 2002, she, Vonda, K.P., K.P.'s sister Jordan, and Pulliam's two children were riding in Pulliam's vehicle on the way to the Children's Advocacy Center. According to Pulliam, the rape allegations had not been discussed with K.P. that day and K.P. was unaware of the reason they were visiting the Center. She further testified that K.P. had

---

[1] The record is not clear regarding when Billy Powell reported the abuse to the family, when the family reported the abuse to the police, or whether appellant was allowed to remain in K.P.'s household after the allegations were made.

not seen appellant that day, and to the best of Pulliam's knowledge, K.P. had not seen appellant since her return (which appellant does not dispute).

Prior to seeing appellant, K.P. was laughing and joking with Pulliam's son, who was in the back seat with her. Pulliam stopped in the road when they met Linda Powell's vehicle. Linda is Pulliam's aunt and K.P's grandmother. Appellant was in the passenger seat of Pulliam's vehicle. Pulliam and Linda, who conversed for approximately one minute with their windows down, agreed that Jordan and Pulliam's daughter would go to Linda's house. Pulliam testified that when K.P. saw Jordan getting into the vehicle in which appellant was seated, K.P. removed her seatbelt, jumped between the bucket seats into Pulliam's lap, stuck her head out of the driver's side window and yelled, "Robert, don't you hurt my sister like you hurt me."

Pulliam further testified that K.P. repeated the statement four or five times, and that she was "very upset" and that "tears [were] coming out of her eyes, streaming." She returned K.P. to her seat and began to drive away, but had to pull over to soothe and comfort her.

On these facts, we hold that the trial court did not err in admitting Pulliam's testimony. First, appellant is simply wrong in asserting that the exciting event must be the crime itself. For support, he erroneously relies on cases in which the startling event *was* the crime itself but ignores authority affirming the admission of statements made in relation to an event that was *not* the crime itself.

For example, in *George v. State*, 306 Ark. 360, 813 S.W.2d 792 (1991), the Arkansas Supreme Court affirmed the admission of a child sexual abuse victim's statement as an excited utterance where, following a nightmare, the child told her mother that the defendant had bitten her on her genital area. In that case, as here, it was not certain how much time had passed between when the abuse had occurred and when the startling event occurred. The victim in *George* had been enrolled in the defendant's day-care program from September 1988 through September 1989, but returned on occasion through October 1989, and visited with the *George* defendant and his wife on October 31, 1989. The victim was willing to see the defendant two weeks prior to Halloween but did not want to visit him on Halloween.

In *George*, the two-and-a-half year old victim awoke from a nightmare on November 2, 1989, complaining that there were dinosaurs in her room that might bite her. When her mother

tried to allay her daughter's fears, the victim insisted, "Yes, there's dinosaurs in there and they are going to bite me and they are going to bite me like [the *George* defendant] bites me." When asked by her mother what she meant, the victim stated, "He bites me on my tee tee" and then pointed to her genital area. The *George* court held the victim's statements were admissible as excited utterances because "they were made at an unusually late hour following a nightmare that clearly terrified the victim." *Id.* at 366, 813 S.W.2d at 796.

Thus, it is clear under *George* that the startling event may be something *other than* the crime alleged. To that extent, appellant's reliance on cases in which our courts have excluded statements regarding abuse as excited utterances because too much time had passed between the abuse and the statement is misplaced. Instead, the issue for this court is whether K.P.'s observance of her sister getting into a vehicle with K.P.'s alleged rapist was a startling event, and whether K.P.'s statement was made in response to that event, while she was under the stress of that event.

We are convinced that a sexual abuse victim's observance of her sister getting into a vehicle with the alleged rapist only a few weeks after the victim had disclosed the abuse would be even *more* startling than the victim merely having a seemingly unrelated nightmare, as occurred in *George*. Further, the evidence is clear that K.P. was responding to the stress of seeing appellant and seeing her sister get into the vehicle with him. Pulliam testified that the issue of the rape had not been discussed that day, and that, to the best of her knowledge, the August 2 incident marked the first time after K.P.'s return from Oklahoma that K.P. had seen appellant. Prior to seeing appellant, K.P. was laughing and joking with her cousin in the back seat. However, when K.P. realized that her sister was getting into the same vehicle as appellant, her demeanor markedly and immediately changed. She left her seat, jumped into Pulliam's lap, and repeatedly yelled at appellant not to hurt her sister the way he had hurt her. K.P. was also shaking and crying and had to be comforted. On these facts, there is no doubt that K.P.'s response was immediate and that it was made under the stress of the event of seeing her sister get into the vehicle with the alleged rapist.

Appellant also argues that the trial court erred in admitting Pulliam's testimony because her testimony was inconsistent in some respects. However, this argument is to no avail,

because it is well-settled that it is the job of the jury, as fact finder, to weigh inconsistent evidence and make credibility determinations. *Harmon v. State*, 340 Ark. 18, 8 S.W.3d. 472 (2000). Further, a witnesses's inconsistent testimony does not render it insufficient as a matter of law. *Id.* As the State notes, although some of the peripheral details were difficult for Pulliam to recall, such as whether she had planned to meet Linda Powell, Pulliam's account of K.P's statement and response to the event were consistent. As such, we hold that the trial court did not err in admitting Pulliam's testimony.

Affirmed.

ROBBINS and BIRD, JJ., agree.