
# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR–15–84

| | | |
|---|---|---|
| | | **Opinion Delivered** October 21, 2015 |
| TRISTAN TRAVIS | | APPEAL FROM THE PULASKI COUNTY |
| | **APPELLANT** | CIRCUIT COURT, FIRST DIVISION |
| | | [NO. CR-2012-1710] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE LEON JOHNSON, JUDGE |
| | **APPELLEE** | |
| | | AFFIRMED |

## BART F. VIRDEN, Judge

On June 20, 2014, appellant, Tristan Travis, was convicted in the Pulaski County Circuit Court of Class Y felony rape and Class D felony second-degree battery of then three-year-old K.S. A jury sentenced Travis to thirty-seven years' imprisonment in the Arkansas Department of Correction on the rape count, and six years' imprisonment for the count of second-degree battery. The circuit court ordered that the sentences should run concurrently, which resulted in an aggregate sentence of thirty-seven years. Travis filed a timely notice of appeal, and for his sole point on appeal Travis asserts that the circuit court erred in finding that K.S. was competent to testify. We disagree, and we affirm.

I.     *Facts*

The incident from which the charges against Travis stemmed occurred on April 20, 2012, when Travis was babysitting then three-year-old K.S. and her younger brother so that his wife and K.S.'s mother could attend a church social function. On June 5, 2014, a pretrial hearing was held to determine whether K.S., who was five years old at the time of the hearing, was competent to testify. At the hearing, the State asked K.S. if she knew the difference between the truth and a lie:

ATTORNEY:  . . . [I]f I told you your blanket was red, is that the truth or is it a lie?

WITNESS:     Lie.

ATTORNEY:  Why is that a lie?

WITNESS:     Because you are telling not the truth.

ATTORNEY:  Okay. What is the truth?

WITNESS:     That you're telling the truth and you don't get sent to your room.

ATTORNEY:  Okay. But what's the truth about your blanket?

WITNESS:     That it's not red. It's pink.

ATTORNEY:  That it's pink. Okay. All right. And can you promise to tell us the truth?

WITNESS:     Yes.

K.S. was sworn in, and again asked if she understood the difference between the truth and a lie:

ATTORNEY:  All right. So what did you just tell that lady? What did you tell her? What did you just say to her?

WITNESS:     I told her that I swear to tell the truth.

SLIP OPINION

ATTORNEY: Okay. And so can you tell us the truth?

WITNESS: Uh-huh.

ATTORNEY: What happens if you don't tell the truth?

WITNESS: You get in trouble.

On direct examination, K.S. described the events of the evening of April 20, 2012. She testified that Travis put a broken crayon into her pee-pee while she was lying on the living room floor. She testified that he put wire hangers in her pee-pee after he put the crayon inside her and that her mother was not there when it happened. She testified that it hurt and that she bled.

K.S. was then cross-examined. K.S. relayed many of the same facts, but she contradicted herself as questioning became lengthy. When questioned, she explained that her mother left her with Travis at his home where they watched television, and she colored. She explained that Travis put a crayon in her pee-pee, and that she was lying on a towel in the living room of his house when it happened. On further questioning, she testified that she could not remember which room in Travis's house she was in when he put the crayon inside her. She testified that after he had put the crayon inside her, he put wires and hangers inside her, and again she testified that it had happened in the living room. K.S. testified that only Travis had touched her pee-pee that day. She testified that her mother came back after Travis had hurt her. K.S. offered contradictory testimony about when and with whom she left the Travis home, and K.S. testified that she recalled speaking to a woman who showed her a drawing of a boy and a girl but that she did not remember talking to a police officer after the incident.

Cross-examination continued, and K.S. related more facts concerning the events of April 20. As the questioning went on, K.S.'s relation of the facts became more contradictory.

The circuit court ruled that K.S. was competent to testify because she had the capacity to transmit a reasonable statement of the events to the jury, and because she had the ability to tell the truth.

The jury trial was held June 18–20, 2014, and K.S. testified. On direct examination, K.S. told the jury that she could tell the difference between a lie and the truth and promised to tell the truth. Many times during direct examination, K.S.'s initial answer was "I don't know." However, when asked again, or if the question was rephrased, K.S. was able to relay facts. When asked several times and several different ways, K.S. consistently supplied the information that Travis put a crayon and hangers inside of her pee-pee and that the event occurred at Travis's home, in his living room. She testified that blood came out of her pee-pee and that it hurt.

K.S.'s testimony became more contradictory and less responsive upon extensive cross-examination. After responding to the defense that she understood the difference between a lie and the truth and that she promised to tell the truth, the defense asked K.S. if she remembered her mother telling her what would happen if she told a lie. K.S. responded, "No" and continued to respond "no" to questions from counsel that attempted to ascertain whether she remembered particular events. The defense argued that K.S. was not competent, and the circuit court resolved the issue by stating that K.S. was competent, but it was for the jury to decide whether she was credible. Eventually, after more questioning, K.S. was nonresponsive and answered "a lie" when asked if she had told the truth or a lie

about Travis. The circuit court stated that it had concerns, but still found that K.S. was competent to testify and that her inconsistency was a credibility issue for the jury.

The State called several other witnesses to testify. According to Dr. Andrew Bozeman, the senior pediatric surgeon who examined K.S. within hours of the incident, K.S.'s injuries in and around her vagina, urethra, and labia caused bleeding and bruising, and it was extremely unlikely that she had caused this trauma to herself because it would have caused "excruciating pain." Experts from the Arkansas State Crime Lab (ASCL) testified that the shorts and underwear worn by K.S. had both K.S.'s blood and Travis's semen on them. There was expert testimony that "within all scientific certainty" the semen was Travis's. The forensic-DNA examiner from the ASCL testified that the coat hanger and the pliers submitted to the lab had K.S.'s blood on them. The State also introduced a videotaped statement Travis made to Detective Jeremiah Terrell, admitting that he had inserted a coat hanger and pliers into K.S.'s vagina. In this videotaped statement, Travis claimed that he panicked, and that is why he did not seek medical attention for the child. He stated to Detective Terrell that he could tell it was very painful to K.S. when he inserted the pliers into her vagina to remove the crayon. Travis never offered an explanation of how his semen got on K.S.'s underwear.

At the conclusion of the trial, the jury found Travis guilty of the charges and sentenced him to a total of thirty-seven years in the Arkansas Department of Correction. This appeal followed.



II. *Competency of the Child Witness*

The question of the competency of a witness is a matter lying within the sound discretion of the circuit court, and in the absence of clear abuse we will not reverse on appeal. *Clem v. State*, 351 Ark. 112, 90 S.W.3d 428 (2002). Any witness is presumed to be competent unless proven otherwise. *Id.*; Ark. R. Evid. 601. The party alleging that a witness is incompetent has the burden of persuasion. *Clem*, *supra*. We have previously set out the procedure and guidelines for determining the competency of a witness:

> To meet that burden the challenging party must establish the lack of at least one of the following: (1) the ability to understand the obligation of an oath and to comprehend the obligation imposed by it; or (2) an understanding of the consequences of false swearing; or (3) the ability to receive accurate impressions and to retain them, to the extent that the capacity exists to transmit to the factfinder a reasonable statement of what was seen, felt or heard.

*Holloway v. State*, 312 Ark. 306, 314, 849 S.W.2d 473, 477—78 (1993) (citations omitted). We have applied the same presumption and standards in deciding the capacity of a child witness to testify. *Id.* We further have observed that the evaluation of the circuit court in these cases is particularly important due to its opportunity to observe the child witness and to assess the child's intelligence and understanding of the need to tell the truth. *Id.* Further, as long as the record supports a circuit court's finding of a moral awareness of the obligation to tell the truth and an ability to observe, remember, and relate facts, we will not hold that there has been a manifest error or abuse of discretion in allowing the testimony. *Ward v. State*, 2014 Ark. App. 408, at 5, 439 S.W.3d 56, 60. Finally, in determining the competency of a child witness, the trial court will examine the child's testimony in its entirety and will not rely solely on the preliminary questioning. *Id.*

In *Modlin v. State*, 353 Ark. 94, 110 S.W.3d 727 (2003), our supreme court dealt with a similar issue. In *Modlin*, a seven-year-old witness testified at the murder trial of his father who had killed his mother two years earlier. At the pretrial hearing, the witness offered somewhat garbled testimony, first telling the court that he did not remember what happened at the Ramada Inn the night his mother died, but then offering coherent testimony as to the events of that night. When the witness was asked if he understood the oath to tell the truth, he shrugged and said that he did not know what it meant to make an oath and that he not did know what would happen if he did not tell the truth. However, he also said thereafter, "I know the difference between right and wrong. If you tell something—when you say something that's wrong—when you say something that's wrong, you'll get in trouble." *Id.* at 100, 110 S.W.3d at 730. The witness also shook his head "no" when asked if he understood what kind of trouble would result. Our supreme court held that the child witness's testimony showed "a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts." *Id.* In the present case, K.S.'s testimony at both the pretrial hearing and at the trial similarly showed that she understood the importance of telling the truth and could relate facts to the jury.

Travis asserts that because K.S. offered conflicting testimony about the events of April 20, the circuit court erred in finding that she could remember and relate the facts to the jury. However, our court has held that "it is well-settled that it is the job of the jury, as fact finder, to weigh inconsistent evidence and make credibility determinations. Further, a witness's inconsistent testimony does not render it insufficient as a matter of law." *Warner v. State*, 93 Ark. App. 233, 249–50, 218 S.W.3d 330, 339 (2005) (citations omitted).

Though K.S.'s testimony was inconsistent at times and became more so upon extensive questioning, her testimony was never incoherent. An example of incoherence is illustrated in a recent case before our court, *Ward*, 2014 Ark. App. 408, at 5, 439 S.W.3d at 60, where the child witness responded to questions concerning his ability to tell the truth with non-responsive, nonsensical answers. In *Ward*, when the witness was asked "what is a lie" he responded "because him think—I tell you that." When he was asked "can you tell me what a lie is" his answer was, "not again." The witness testified that the appellant touched his "privates" but could not identify what part of his body that was. *Id*. In the present case, K.S.'s statements became contradictory after lengthy questioning; however, she never displayed the incoherence of the witness in *Ward*.

### III. *Conclusion*

K.S.'s testimony showed a moral awareness of the obligation to tell the truth and an ability to observe, remember, and relate facts. We find no abuse of discretion in the circuit court allowing K.S. to testify, and therefore, we affirm.

Affirmed.

GLOVER and VAUGHT, JJ. agree.

*Sandra S. Cordi*, Deputy Public Defender, by: *Clint Miller*, Deputy Public Defender, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.